**Roy C. DAY, et al., Plaintiffs,**

v.

**CITY OF DAYTON, OHIO, et al., Defendants.**

**No. C–3–80–438.**

United States District Court, S.D. Ohio, W.D.

Oct. 23, 1984.

William D. Forbes, Miamisburg, Ohio, Robert F. Jeffries, Dayton, Ohio, for plaintiffs.

Thomas P. Randolph, Deputy Director of Law, Dayton, Ohio, for defendant, City of Dayton.

Gerald F. Kaminski, Asst. U.S. Atty., Dayton, Ohio, for defendant, U.S. Dept. of Transp., F.A.A.

DECISION AND ENTRY OVERRULING DEFENDANTS' MOTION TO DISMISS; FINDINGS OF FACT AND CONCLUSIONS OF LAW; JUDGMENT TO BE ENTERED FOR DEFENDANTS; ENTRY OF JUDGMENT; TERMINATION ENTRY

RICE, District Judge.

This action arises out of the purchase of certain real property, near the James M. Cox Dayton International Airport ("Air-

port"), by the Defendant City of Dayton ("Dayton"), from Plaintiffs Roy C. Day and Mary M. Day ("Days"). Plaintiffs Donald B. Allen and Jean R. Allen ("Allens"), also owned real property near the Airport which they sold to Dayton. Plaintiffs Kenneth D. Lawson and Janet L. Lawson ("Lawsons"), were tenants on the real property which the Allens sold to Dayton. In this action, Plaintiffs seek compensation for certain relocation expenses arising out of the sale of their properties. The Plaintiffs base their claims on alternative theories: 1) the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("Uniform Relocation Act"), 42 U.S.C. § 4601 *et seq.;* 2) promissory or equitable estoppel. The Plaintiffs assert the second theory against only Defendant Dayton. Both Defendants, Dayton and the United States Department of Transportation, Federal Aviation Administration ("FAA") deny liability.

The Court heard this case without a jury. At the conclusion of Plaintiffs' case in chief, Defendants moved to dismiss Plaintiffs' Complaint, pursuant to Rule 41(b), Fed.R.Civ.P. The Court took Defendants' motions under advisement and informed the parties that it would rule on this motion before ruling on the merits of Plaintiffs' claims. The Court, having considered Defendants' motions, overrules same. Accordingly, the Court now states its Findings of Fact separate from its Conclusions of Law, pursuant to Rule 52, Fed.R.Civ.P.

## I. FINDINGS OF FACT

1. Plaintiffs Roy C. Day and Mary M. Day ("Days"), husband and wife, owned and occupied residential property ("Day property"), located on the north side of State Route 40, west of Dog Leg Road, in Montgomery County, Ohio. The Day property is southwest of the terminus of the Airport's Runway 6L. An extension of the centerline of Runway 6L would run through the Day property. The Day property is more than one mile beyond the end of Runway 6L. When the Days acquired their property in June, 1972, Runway 6L

was in operation, a fact of which the Days were aware.

2. Plaintiffs Donald B. Allen and Jean R. Allen ("Allens"), husband and wife, owned and occupied residential property ("Allen property"), located on the north side of State Route 40, west of Dog Leg Road in Montgomery County, Ohio. The Allen property abuts and is just to the west of the Day property. The Allen property is southwest of the terminus of the Airport's Runway 6L. An extension of the centerline of Runway 6L would run through the Allen property. The Allen property is located more than one mile beyond the terminus of Runway 6L. When the Allens purchased their property in March, 1971, Runway 6L was in operation, a fact of which the Allens were aware.

3. In 1978 and 1979, a one bedroom cottage was located on the Allen property. In May, 1978, Plaintiffs Kenneth D. Lawson and Janet L. Lawson ("Lawsons"), husband and wife, began occupying the cottage as month-to-month tenants. Before beginning their tenancy, the Lawsons knew that Runway 6L was in operation.

4. Defendant City of Dayton ("Dayton"), is a political subdivision of the State of Ohio and is incorporated under the laws of Ohio. Dayton owns and operates the Airport.

5. Defendant, United States Department of Transportation, Federal Aviation Administration, is an Executive Department of the United States Government. It was established by Congress and is administered by an Administrator who is appointed by the President with the advice and consent of the United States Senate. The United States Department of Transportation, Federal Aviation Administration and its Administrator will be collectively referred to as "FAA".

6. In 1969, Runway 6L at the Airport was constructed with federal financial assistance under the Airport Development Assistant Program ("ADAP"). At least half of the funds necessary to construct Runway 6L were provided under this federal grant. Between 1970 and 1980, Dayton

received no federal financial assistance for the maintenance or improvement of Runway 6L. However, since 1969, FAA has provided federal financial assistance, under ADAP, to Dayton for various other Airport projects. Additionally, FAA air traffic controllers have directed all air traffic using Runway 6L throughout its existence.

7. Dayton and the FAA entered into a grant agreement on August 15, 1979, which was amended July 7, 1980, for the purpose of providing federal assistance for improvements to Runway 6L. The FAA did not approve any land acquisitions as part of this agreement.

8. Planes which took off from and landed on Runway 6L flew directly over the Day and Allen properties.

9. At some point after 1975, the noise from aircraft landing on and taking off from Runway 6L became intolerable for the Days and the Allens. Because of the proximity of Runway 6L and its concomitant noise, the Allens and Days felt they were not able to enjoy their yards, and they felt unable to have overnight guests. As a result of the noise, the Days and Allens decided that they would have to sell their houses and move.

10. During 1978, the Days put their house on the market by listing it with a real estate broker. The Days listed first for $73,000, then for $70,000. While the house was on the market, six or seven people looked through it, and the Days received only one offer for it. That offer was refused because of the short time given for acceptance. Had the Days sold their house on the open market, they would not have received relocation monies or expenses from the Defendant, and 5% to 6% would have been deducted from any amount they received for real estate commission.

11. In early 1978, Mr. Day contacted Ellsworth Szkudlarek, Aviation Engineer at

the Airport, and asked him if Dayton would purchase the Day property. Szkudlarek wrote the FAA's James Opatrnz to find out whether the cost of acquiring the Day property would be eligible for ADAP participation. The FAA orally informed Dayton that it would receive no federal financial assistance in acquiring the Day property. Subsequently, in April, 1978, Szkudlarek wrote the Days and informed them that the FAA would not participate in the Airport's acquisition of their property.

12. In January, 1979, Mr. Allen contacted James R. Wood, Director of Aviation at the Airport, to ask him whether Dayton would purchase his house. As a result of this initial contact and, at Plaintiffs' request, Wood met Messrs. Allen and Day to discuss the purchase of their properties.[1] At that meeting, Mr. Allen said that he would sue Dayton to force it to purchase his house if Dayton did not willingly do so. Although Wood did not indicate that the Airport needed either property, he did indicate that the Airport would make every effort to have Dayton purchase the properties. Wood suggested that they obtain two independent appraisals of each property. Dayton would then offer them the higher appraisal for their properties. At that meeting, Wood made no representations or statements about the availability of relocation benefits. Wood wanted Dayton to buy the Day and Allen properties because he felt that the Airport had a moral obligation to purchase the properties since he believed the properties were adversely effected by noise and since he felt purchasing them would avoid a possible inverse condemnation suit.

13. The Allens and Days willingly and voluntarily initiated the negotiations which led to the eventual sale of their respective houses to Dayton. Neither Dayton, the Airport, nor the FAA[2] intimated to the Plaintiffs that condemnation proceedings

1. Charles Lewis, a neighbor of the Days and Allens, was also present at the meeting.

2. There is no evidence before the Court from which it could infer that the Plaintiffs, collectively or individually, had contact with the FAA or any of its employees regarding the sale of their properties. Plaintiffs do not claim otherwise.

would be instituted if they did not voluntarily sell their properties to Dayton.

14. Subsequent to the meeting with Wood, the Days received a letter from James C. Hall, Superintendent of the Dayton Redevelopment Department. In the letter, Hall told the Days that Dayton has a relocation office and that the relocation office, "will determine the amount of relocation benefits and moving expenses that owner/occupants and tenants will receive." Plaintiffs' Exhibit # 5. The Allens received a similar letter from Hall.

15. William Kirshe, a representative of Dayton, informed the Allens and the Days that they were eligible for relocation benefits, including moving expenses. Kirshe told them that they were eligible to receive *up to* $15,000. Kirshe did not put a dollar figure on what either the Days or the Allens would receive; rather, he merely informed them what was the maximum amount for which they were eligible.

16. On April 17, 1979, the Days executed an offer to sell their property to Dayton. Plaintiffs' Exhibit # 6. The offer was for $70,000, and it did not refer to relocation benefits. The Allens executed a similar offer, which likewise did not mention relocation benefits.

17. After the Days executed the offer and before the closing, the Days received a letter, Plaintiffs' Exhibit # 10, from Gail Lawson, a relocation counselor with Dayton. The letter said that the Days may be eligible for a relocation payment up to a maximum of $15,000.

18. When the Days had their closing on June 1, 1979, Ed Roe, an attorney for Dayton, informed them that they might be eligible for up to $15,000 relocation benefits. Roe made a similar statement to the Allens at their closing.

19. From the initial meeting between Day, Allen and Wood, to the closings on the Allen and Day properties, no employee, agent or representative of Dayton informed either the Days or the Allens that they *would* receive a *specific* sum of relocation benefits. Likewise, no such person

ever told either the Days or the Allens generally what amount, if any, of relocation benefits they would receive. Rather, in those instances when such a person informed either the Days or the Allens that they would receive relocation benefits, the amount was recited as up to a maximum of $15,000, with or without moving expenses.

20. The Days and Allens did not decide to execute offers to sell their properties, to close the sale of their properties or to purchase new houses on any statements regarding the availability of relocation benefits.

21. The Lawsons voluntarily quit their tenancy in the cottage on the Allen property in order to move to Tennessee, where Mr. Lawson had secured a job. The Lawsons did not receive a written order from Dayton to vacate the cottage.

22. Dayton received no federal assistance for the purchase of the Day and Allen properties.

23. In 1967, Dayton filed a 20-year master plan for the Airport with the FAA. This plan has been updated every five years since then. In part, the master plan sets forth a layout of the property owned by the Airport and the property that it intends to acquire. Neither the master plan, nor any five-year supplementations, included plans for the acquisition of the Day property, the Allen property or any other property west of Dog Leg Road. Neither the master plan, nor any of the five-year supplementations, included plans for the expansion of Runway 6L in the direction of the Day and Allen properties.

24. The Airport has never conducted a detailed noise study, either in connection with the development of the master plan and its five-year supplementations or for any other purpose.

25. The Day and Allen properties are located approximately 3,000 feet beyond the clear zone for Runway 6L. The clear zone extends approximately one mile beyond the terminus of Runway 6L.

26. The Airport did not need to acquire either the Day and Allen properties for

safety reasons. Indeed, at the time of trial, the Day and Allen properties were occupied by tenants of Dayton. Also, Dayton was considering selling the properties.

27. The Days and the Allens owned and occupied their homes for more than six months prior to commencing negotiations for the sale of their homes to Dayton. The Lawsons were tenants of the Allens for more than six months prior to the Allens commencing negotiations for the sale of their property.

28. Plaintiffs purchased or rented replacement homes which were decent, safe and sanitary within one year after they moved. They submitted claims for relocation benefits within 18 months after the dates of their moves.

29. In September, 1979, Dayton informed the Plaintiffs that they were not eligible for relocation benefits. None of the Plaintiffs has received any relocation benefits.

## II. DISCUSSION

The Plaintiffs support their claims for the recovery of relocation benefits with two independent theories. *First*, the Plaintiffs claim that they are entitled benefits under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("Uniform Relocation Act"), 42 U.S.C. § 4601 *et seq.*[3] *See* Doc. # 28 at 1. *Second*, the Plaintiffs allege that they relied, to their detriment, upon assurances from Dayton that relocation benefits would be forthcoming. *See Id.* The Plaintiffs assert their second theory against only Dayton. The Court will discuss these theories in order.

### A. Uniform Relocation Act

The Plaintiffs contend that they are "displaced persons" under the Uniform Relocation Act. Once it is determined that some-

one is a "displaced person" within the meaning of that Act, it provides for the payment of relocation benefits. *See e.g.* §§ 202 and 203 of the Uniform Relocation Act, 42 U.S.C. §§ 4622–23. Section 101(6) of the Uniform Relocation Act, 42 U.S.C. § 4601(6), defines "displaced person" as, "any person who ... moves from real property ... as a result of the acquisition of such real property ... for a program or project undertaken by a Federal agency, or with Federal financial assistance...."

■ The Court rejects Plaintiffs' contention that because Runway 6L is a federally assisted project, built with federal financial assistance and operated in part by federal employees, that any *property acquisitions* related to Runway 6L are *ipso facto* acquired for a program or project undertaken with Federal assistance. In making their argument, Plaintiffs rely on *Lake Park Home Owners' v. United States Dept. of H.U.D.*, 443 F.Supp. 6 (S.D.Ohio 1976). In *Lake Park Home Owners'*, the Defendant, HUD, argued that in order to be a displaced person under the Uniform Relocation Act, " 'a person must have his property ... directly acquired [either] by the federal government (§ 4622) or by a state agency (§ 4630) receiving federal financial assistance for the specific acquisition.' " *Id.* at 8. In rejecting this assertion, Judge Duncan said:

The pertinent question arising from [the statutory definition of displaced person] is not whether federal monies directly funded the acquisition of the real property involved, but whether the state program or project which resulted in the acquisition was federally assisted. Under HUD's construction of the section, the "displaced person" status of a tenant or homeowner would be dependent upon whether the federal funding agency agreed to participate directly in the ac-

---

**3.** Plaintiffs' Amended Complaint (Doc. # 13), contains three claims for relief. In the second claim for relief, Plaintiffs allege that Dayton failed to properly notify the Allens that they would have to move into a more expensive home in order to get maximum benefits. This claim is dependent on the availability or reloca-

tion benefits under the Uniform Relocation Act. Even assuming *arguendo* that Dayton had a duty to properly inform the Allens of how to maximize their relocation benefits, that duty was not breached if such benefits were not legally available.

quisition of the real estate involved in a state program or project. The federal participation in a given state project might be quite substantial, but if federal dollars were funneled to program or project costs other than land acquisition, no one moving as a result of the program or project would, under HUD's construction of the section, be a displaced person. The statutory definition plainly runs contrary to such an analysis. The statute turns on whether there is federal funding of the program or project, not whether federal funds can be traced directly to the acquisition of a particular parcel of real estate.

*Id.* at 8–9 (emphasis in the original).

 This Court concurs with Judge Duncan's construction of § 101(6), 42 U.S.C. § 4601(6). It is not necessary for Plaintiffs to prove that Dayton received federal financial assistance for the acquisition of their specific properties. However, this does not mean that Plaintiffs are displaced persons merely because Dayton received federal assistance for the construction of the Airport and Runway 6L. The Court does not read either § 101(6) or *Lake Park Home Owners'* that broadly. Rather, in order for someone to be a displaced person, there must be some present nexus between a federally assisted program or project and the acquisition of that person's property. *Lake Park Home Owners'* supports this conclusion. Therein, Judge Duncan found that the Plaintiffs were not displaced persons because the city, Coshocton, acquired Plaintiffs' properties long before federal funding for the state project entered the picture. Here, the converse is true. The FAA provided Dayton with financial assistance for the construction of Runway 6L, long before Dayton acquired Plaintiffs' properties. The decision to pur-

chase the Plaintiffs' properties was not influenced in any aspect by the possible existence or non-existence of federal funding, either as an aid in such purchase or as an aid in the construction of Runway 6L in the first instance. Finally, giving the Uniform Relocation Act the expansive reading which Plaintiffs suggest would be contrary to the practical construction placed on the Act by the Supreme Court. *See Norfolk Redevelopment and Housing Authority v. Chesapeake and Potomac Telephone Company of Virginia*, 464 U.S. 30, 104 S.Ct. 304, 78 L.Ed.2d 29 (1983). (Utilities forced to relocate by federally assisted projects, are not "displaced persons" within the meaning of the Uniform Relocation Act); *Alexander v. U.S. Dept. of H.U.D.*, 441 U.S. 39, 99 S.Ct. 1572, 60 L.Ed.2d 28 (1979) (Tenants forced to relocate by foreclosure on housing project with federally guaranteed financing, are not "displaced persons").[4]

However, Plaintiffs argue that there was sufficient evidence before the Court to support a conclusion that Plaintiffs' properties were acquired to further a federally assisted project, and that the federally assisted project caused Dayton to acquire Plaintiffs' properties thereby displacing them. Plaintiffs' Post Trial Memorandum (Doc. # 36), at 6. To support this contention, Plaintiffs assert that the acquisition of their properties furthered Airport purposes because their properties are noise impacted and because the acquisition was necessary for safety reasons. This, the Plaintiffs argue, was all part of a federally assisted project. In the Court's view, either of these purposes would provide a nexus between the acquisition of Plaintiffs' properties and a federally assisted · program or project, if there were sufficient evidence before the Court for it to find that the acquisition of

4. Although neither of these decisions is directly on point, they nevertheless shed considerable light on the meaning of the term "displaced person." Each case has stressed the importance of construing this term in light of the purposes of the Act. *See Norfolk Redevelopment and Housing Authority, supra* 104 S.Ct. at 307–08. The two major purposes of the Uniform Relocation Act were to bring uniformity to myriad federal programs providing for the payment of relocation benefits and to alleviate the injuries of those who are forced to move by federal and federally assisted programs. *Id.* Neither of these purposes will be enhanced by requiring the payment of relocation benefits to anyone whose property is acquired by a program or project which once received federal assistance.

Plaintiffs' properties came within the federal programs for acquisition of land for safety or noise reasons.

▆ As the Plaintiffs argue, two federally assisted projects [5] are implicated by the acquisition of their properties. However, an examination of each of these projects reveals that the acquisition of Plaintiffs' properties does not qualify for federal assistance under either program. Thus, Plaintiffs' properties were not acquired in furtherance of a federally assisted project, and the Court concludes that there is not a nexus between the acquisition of Plaintiffs' properties and a federally assisted project.

*First,* FAA Regulation 5100.33, Interim Instructions For Processing ADAP Requests For Land Purchase For Noise Compatibility Purposes, is a federally assisted project by which airports can acquire interests in land.[6] However, the acquisition of Plaintiffs' properties does not qualify under this program because neither Dayton, nor the Airport has developed the comprehensive noise control and land-use compatibility plan. Such a study is necessary to initially trigger eligibility for ADAP participation in land acquisitions for noise purposes. There was testimony that a noise study (ASDS noise study) had been conducted at the Airport; however, the uncontroverted testimony was that Dayton and the FAA deemed that study to be inadequate. Consequently, neither ever accepted that study. Additionally, Plaintiffs reliance on testimony by Wood, that he recommended the purchase of their properties

because the properties were noise impacted, is misplaced. In the absence of the requisite noise study, Regulation 5100.33 is not available for ADAP grants.

*Second,* § 604 of the ADAP Handbook, FAA Order 5100.36,[7] provides for ADAP grants for acquisition of certain land beyond the terminus of a runway. For instance, it provides for ADAP participation in acquisition of land in the clear zone. However, the Court has found, based on uncontroverted evidence, that Plaintiffs' properties were outside the clear zone. Section 604c says that land in the approach area meeting certain criteria is eligible for ADAP participation. Defendants' Exhibit C at 107. Plaintiffs' properties are unquestionably within the approach area to Runway 6L. However, Plaintiffs properties do not meet the criteria [8] for ADAP participation because the properties are more than 5000 feet beyond the end of Runway 6L and because the acquisition of the properties is not necessary to satisfy forecast Airport needs. Accordingly, the Court concludes that the acquisition of Plaintiffs' properties is not eligible for ADAP participation under Order 5100.33. Consequently, the acquisition of Plaintiffs' properties was not, in this regard, in furtherance of a federally assisted project.

Plaintiffs also argue that acquisition of their properties furthered an airport purpose by making Runway 6L more safe. In making this argument, Plaintiffs contend that Runway 6L is a federally assisted project because it was built with an ADAP

---

5. The regulations governing payment of relocation benefits by the FAA are in 49 C.F.R. Pt. 25. These regulations provide for the payment of relocation benefits to persons who are displaced by federally assisted projects. *See e.g.* 49 C.F.R. §§ 25.111, 25.171. "Federally-assisted" is defined, therein, as "assisted by a grant, loan or contribution by the United States...." *Id.* at § 25.3. In the present case the acquisition of Plaintiffs' properties received no federal assistance.

6. Regulation 5100.33 is Plaintiffs' Exhibit # 34.

7. Order 5100.36 is Defendants' Exhibit C.

8. The relevant portion of § 604c provides:

(1) Land necessary to restrict the use of areas adjacent to, or in the immediate vicinity of the airport as defined below to activities and purposes compatible with normal airport operations as well as to meet current and anticipated development at the airport. Where sponsors have the capability to acquire property which will satisfy the total ultimate forecast needs of their airport based on an approved master plan they should be encouraged to do so. The dimensions cited below are to be considered as desirable minimums.

(a) At airports serving or anticipated to serve turbojet aircraft, such areas of land may extend up to 1250 feet laterally from the runway centerline, extending 5000 feet beyond the end of the primary surface.

grant and it is operated with FAA employed air traffic controllers. Accepting Plaintiffs' basic premise that Runway 6L is a federally assisted project, the acquisition of Plaintiffs properties did not further that project by enhancing its safety. Based on the evidence before it, the Court found that the acquisition of Plaintiffs' properties was not required for safety reasons.

Based on the foregoing, the Court concludes that Plaintiffs are not "displaced persons" as that term is used in the Uniform Relocation Act. Consequently, Plaintiffs are not entitled to relocation benefits under the Uniform Relocation Act.

### B. Promissory Estoppel

Under the independent theory of promissory or equitable estoppel, Plaintiffs contend that Dayton should be estopped from denying the fact that Plaintiffs are entitled to relocation benefits. Plaintiffs assert that they relied on representations made by employees and agents of Dayton that they were eligible for relocation benefits. Plaintiffs argue that the Days and Allens either would not have entered into contracts for the sales of their properties, or closed the sales without the representations. Further, Plaintiffs argue that the Days would not have purchased their new house without such representations, and that the Lawsons would not have moved without the representations that they were eligible for relocation benefits.

The concept of promissory estoppel is now embodied in § 90(1) of the Restatement (2d) of Contracts, which provides:

A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Section 90 has been adopted by the Ohio Supreme Court. *McCroskey v. Ohio*, 8 Ohio St.3d 29, 456 N.E.2d 1204 (1983); *Tal-*

*ley v. Teamsters Local No. 377*, 48 Ohio St.2d 142, 357 N.E.2d 44 (1976).

 Based upon the evidence before it, the Court concludes that the Plaintiffs have not proved their claims for promissory estoppel.[9] The Plaintiffs have failed to prove that any promise concerning the availability of relocation benefits induced any action or forebearance by any Plaintiff. An essential element of the Plaintiffs' claim based on a theory of promissory estoppel is that a promise by an employee or agent of Dayton induced such an action or forebearance. *See* § 90(1), *supra.*

As stated above, the Plaintiffs claim that representations about their eligibility for relocation benefits induced them to enter into contracts for the sale of their properties and to close those sales, that the representations induced the Days to purchase a new, more expensive house and that the representations induced the Lawsons to move. Indeed, there was testimony to this effect. *See* Transcript ("Tr.") at 29, 36–37, 75, 91–94, 122. However, when these statements are viewed in context with the other evidence presented to the Court, the statements lose all credibility.

Addressing the Lawsons first, the Court has found, as a matter of fact, that they did not move from the cottage on the Allen property because of promises or representations that they would receive relocation benefits. Rather, they moved from the cottage because Mr. Lawson was able to find a job in Tennessee. The Lawsons moved from the cottage to Tennessee.

Neither the Days nor the Allens was induced into any act because of promises of relocation benefits. The Days and Allens approached Dayton, the buyer of last resort, because life beyond the terminus of Runway 6L had become intolerable for them. The noise and vibrations associated with jets taking off and landing had made it impossible for them to enjoy their homes. At their meeting with Wood, Mr. Day and

---

**9.** The mere fact that Plaintiffs were incorrectly informed that they were eligible for relocation benefits, without more, does not establish their estoppel claim. *See e.g. Jensen v. United States,* 721 F.2d 692 (10th Cir.1983).

Mr. Allen told him that if Dayton did not buy their properties, they would file a lawsuit to force such a purchase. At some point subsequent to the meeting with Wood, the Days and Allens were told that they were eligible for relocation benefits. However, the quality of these representations is not such that induces persons to act; nor did they induce the Plaintiffs to act in this case. *See e.g.*, Plaintiffs Exhibit # 5 ("The Relocation Office will determine the eligible amount of relocation benefits and moving expenses that owner occupants and tenants will receive."); Plaintiffs' Exhibit # 10 ("the Bureau of Relocation has determined that you may be eligible for a payment of up to a maximum of $15,000"). More importantly, neither the Days nor the Allens was ever told even generally how much they would receive in relocation benefits. All they were told was that they could receive up to $15,000.

There is an additional reason to conclude that the Days' actions were not induced by representations about relocation benefits. Dayton paid $70,000 for the Days' house. That is the same amount for which the Days had previously listed their house on the open market. If the Days had managed to sell their house for that amount on the open market, a 5% to 6% real estate commission would have been deducted from the amount the Days received. No such real estate commission was deducted from the amount the Days received from Dayton. The Days actually received, therefore, a greater net amount from the sale of their property to Dayton than they would have received had they sold their home on the open market for the $70,000 figure. Thus, it is implausible to argue that promises of eligibility for some unstated amount of relocation benefits induced the Days to enter into a contract for the sale of their house to Dayton and ultimately to close that sale.

### III. CONCLUSIONS OF LAW

1. The Court has jurisdiction over Plaintiffs' claims under the Uniform Relocation Act pursuant to 28 U.S.C. § 1331. *See*

*Lake Park Home Owners Association v. HUD, supra* at 7.

2. The Plaintiffs promissory estoppel claims and their claims under the Uniform Relocation Act "derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Accordingly, the Court has pendent jurisdiction over the promissory estoppel claims. *Id.*

3. The acquisition of Plaintiffs' properties did not qualify for ADAP grants under either 5100.33 or 5100.36.

4. Plaintiffs are not "displaced persons" within the meaning of § 101(6) of the Uniform Relocation Act, 42 U.S.C. § 4601(6).

5. Plaintiffs are not entitled to relocation benefits under the Uniform Relocation Act, 42 U.S.C. § 4601 *et seq.*

6. Since the Plaintiffs were not induced into any action by representations about the availability of relocation benefits, Plaintiffs are not entitled to recover under a theory of promissory estoppel.

Based on the foregoing, the Court hereby orders that judgment be entered for the Defendants and against the Plaintiffs herein. The Clerk of Courts will enter judgment on behalf of the Defendants.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.