**In re Application for RELOCATION BENEFITS OF JAMES BROTH-ERS FURNITURE, INC.**

**No. C6–01–1359.**

Court of Appeals of Minnesota.

April 16, 2002.

Kirk A. Schnitker, Jon W. Morphew, Schnitker & Associates, P.A., Minneapolis, for relator James Brothers Furniture, Inc.

Thomas M. Scott, Campbell Knutson, P.A., Eagan, for respondent Robbinsdale Economic Development Authority.

Considered and decided by HARTEN, Presiding Judge, G. BARRY ANDERSON, Judge, and STONEBURNER, Judge.

## OPINION

G. BARRY ANDERSON, Judge.

Respondent terminated relator's month-to-month lease. Relator applied for relocation benefits under Minn.Stat. §§ 117.50–56 (1998). Respondent denied relator relocation benefits. A hearing officer determined relator was entitled to relocation benefits. After consulting with relator, a relocation-benefits consultant determined that respondent was liable for $12,433 in relocation benefits. At a subsequent hearing, relator contested the $12,433 determination. The hearing officer denied relator's claims for benefits in excess of $12,433. Respondent subsequently adopted a resolution denying that it was liable for any relocation benefits; but, respondent agreed that if it was liable for any such benefits, those benefits should be limited to $12,433. We reverse and remand.

## FACTS

James Brothers Furniture, Inc., (relator) occupied retail property owned by Minneapolis Gold and Silver Corporation (MG & S), in Robbinsdale, Minnesota. It is unclear whether relator and MG & S ever entered into a formal lease agreement.[1] In April 1990, an adjacent McDonald's restaurant informed respondent Robbinsdale Economic Development Authority (REDA) that it planned to raze its existing building and partially re-locate and re-build its restaurant. REDA contemplated re-development of the immediate area in conjunction with the McDonald's project. Between April 1990 and September 1992, REDA held several meetings where redevelopment of the immediate area was discussed. REDA contemplated either purchasing or condemning the MG & S property and subsequently entered into a one-year option contract with MG & S that allowed REDA to purchase the property, but that also allowed MG & S to remain on the property for one year rent-free if REDA exercised its option to purchase.

REDA exercised its option to purchase the property and closed on the property in late June 1993. REDA concedes that part of the MG & S property was used to accommodate the McDonald's project. MG & S and relator, however, continued to occupy the remaining REDA property for one year thereafter under the rent-free occupancy agreement. One year later, the occupancy agreement expired and relator and REDA subsequently entered into a written month-to-month lease agreement that required 90 days' notice to terminate the lease and vacate the property.

---

1. James Senden was relator's president and James Willard was apparently an original shareholder. James Willard also owned MG & S. Although the record is not entirely clear, it appears relator and MG & S were initially treated as the same business entity by respondent. The record also suggests relator and MG & S never attempted to demarcate the differences between the two entities until it served their purposes in this matter.

In May 1999, REDA granted development rights to a business to re-develop the area adjacent to and including the remaining REDA property. On May 12, 1999, to prepare for the re-development, REDA gave relator 90–days' notice to vacate the property.

In response to REDA's 90–days' notice, relator initially contemplated moving its business to another retail location, but ultimately decided to liquidate most of its inventory and terminate its operations. Relator contracted with Monk Enterprises, Inc. (Monk), an inventory broker, to liquidate its inventory. Relator sold most of its inventory to Monk, and Monk conducted an inventory-liquidation sale at the property; James Senden, relator's president, moved the balance of the unsold inventory to the homes of family and friends. In late October 1999, relator vacated the property.

By letters dated November 22 and December 30, 1999, relator requested relocation benefits from REDA. REDA denied relator benefits concluding that relator was not a "displaced person" as defined by Minn.Stat. § 117.50, subd. 3 (1998). Relator requested an administrative appeal and a hearing was held on the eligibility issue. The hearing officer concluded relator was a "displaced person" under the statute and, therefore, concluded that relator was entitled to relocation benefits. The hearing officer also concluded that MG & S did not waive relator's right to relocation benefits as part of its purchase agreement with REDA.

REDA subsequently hired Conworth, Inc. (Conworth), a relocation-benefits consultant, to assist relator in preparing its relocation claims. After consulting with relator, Conworth determined relator was entitled to $12,433 in relocation benefits. Relator disputed that amount and alleged that it was entitled to additional relocation benefits.

On March 8 and May 15, 2001, another administrative hearing was held focusing on the amount of relator's claims. By letter dated June 25, 2001, the same hearing officer denied relator's claims in excess of $12,433. On July 10, 2001, REDA adopted a resolution that accepted the hearing officer's factual findings made after the first hearing, but rejected the hearing officer's legal conclusion that relator was a "displaced person" entitled to relocation benefits. In the alternative, REDA concluded that if relator is a "displaced person," it is entitled to no more than $12,433 in relocation benefits. This appeal followed.

## ISSUES

I. What is the final administrative decision?

II. Is relator a displaced person?

III. Is relator entitled to additional relocation benefits?

IV. Were relator's procedural due-process rights violated because the hearing officer was the city manager of a neighboring city, which was also represented by respondent's attorney's law firm?

## ANALYSIS

In 1973, the legislature enacted the Minnesota Uniform Relocation Act (MURA). *See generally* Minn.Stat. § 117.50–56 (2000). The act intended to make public funds available to reimburse relocation costs incurred by households and businesses displaced by public acquisitions of property where there is no federal financial participation. *See* Minn.Stat.

§ 117.52. Under MURA, an "acquiring authority"[2] must

> as a cost of acquisition, * * * provide all relocation assistance, services, payments and benefits required by the [federal] Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 * * * and those regulations adopted pursuant thereto.

*Id.*

## I.

Relator argues that the only decision that may be reviewed by this court is the hearing officer's June 25, 2001 decision concerning the amount of relocation benefits due relator. Relator argues that the hearing officer's June 5, 2000 decision concerning relator's eligibility for relocation benefits may not be reviewed because it was a final decision and the time for appeal of that decision has expired. Moreover, relator argues that this court may not review REDA's July 10, 2001 resolution because the hearing officer's decision is the only final decision under MURA.

The Code of Federal Regulations discusses the procedure for appealing initial agency decisions denying certain relocation benefits under the federal act:

> Any aggrieved person may file a written appeal with the Agency in any case in which the person believes that the Agency has failed to properly consider the person's application for [relocation] assistance * * *.

49 C.F.R. § 24.10(b) (2000). In addition, an agency or other appointing authority has broad discretion in selecting an official to consider the appeal:

> The Agency official conducting the review of the appeal shall be either the head of the Agency or his or her authorized designee. However, the official shall not have been directly involved in the action appealed.

49 C.F.R. § 24.10(h). If the official conducting the appeal does not grant the full relief requested, "the Agency shall advise the person of his or her right to seek judicial review." 49 C.F.R. § 24.10(g).[3]

A final administrative decision under MURA may only be reviewed by certiorari to this court as provided by Minn.Stat. § 606.01 (2000). *Naegele Outdoor Adver., Inc. v. Minneapolis Cmty. Dev. Agency,* 551 N.W.2d 235, 237 (Minn.App.1996).[4]

There is no published Minnesota case law directly on point that addresses what constitutes the final administrative decision under MURA. It is unclear, moreover, whether it would be proper for the federal act to serve as the basis for MURA's appeal procedure in this case.[5]

We conclude that the proper appeal procedure in this case, where the acquiring authority does not have state-

---

**2.** "Acquiring authority" is defined as "the state and every public and private body and agency thereof which has the power of eminent domain." Minn.Stat. § 117.50, subd. 5(a) (2000). The parties do not dispute that REDA is an acquiring authority.

**3.** "Judicial review" is not defined in the Code of Federal Regulations.

**4.** Writs of certiorari under Minn.Stat. § 606.01 must be issued within 60 days after the applying party receives notice of the final administrative decision.

**5.** MURA only references the federal act's substantive provisions; it does not expressly incorporate the federal act's procedural provisions, including the federal act's appeal procedure. Although MURA references the "regulations adopted pursuant" to the federal act, it only alludes to the regulations when mandating that the acquiring authority provide the substantive "relocation assistance, services, payments and benefits required by the" federal act. Minn.Stat. § 117.52.

wide jurisdiction, must be dictated by common-law and constitutional procedural due-process principles.[6] We also conclude that the hearing officer's decisions are the final administrative decisions in this case, and the hearing officer's initial eligibility determination may also be reviewed by this court because relator's rights were not finally determined until after the second hearing.

In *Naegele*, the Minneapolis Community Development Agency (MCDA) awarded Naegele certain relocation benefits under MURA; but Naegele disputed the amount of the benefits. *Id.* at 236. MCDA appointed a hearing officer to conduct Naegele's appeal. *Id.* The hearing officer decided Naegele was not entitled to the amount of benefits he requested, and "notified the parties of 'the right to seek judicial review of th[e] decision.'" *Id.* MCDA did not independently review the hearing officer's decision. The *Naegele* court noted, "Both parties concede that the hearing officer's decision was quasi-judicial," and concluded that "[j]udicial review of an administrative body's quasi-judicial decision must be invoked by writ of certiorari * * *." *Id.* (citations omitted). Therefore, the *Naegele* court implicitly recognized that the hearing officer's decision was the "administrative body's quasi-judicial decision" and subsequent review of that decision could only lie with this court and not with the agency. *Id.* at 236–37.

■ Therefore, we conclude that a party that is denied relocation benefits by a hearing officer or other appointed agency official on review from an initial agency decision is entitled to judicial review of that hearing officer's or official's decision by certiorari to this court, and subsequent independent review within the agency may not occur.[7] *Cf. Wax 'N Works v. City of St. Paul*, 213 F.3d 1016, 1019–20 (2000) (noting in dictum that "[u]nder the [MURA] * * * the source of relief subsequent to the administrative agency appeal is review by a court").

■ The hearing officer's initial eligibility determination may also be reviewed by this court because "certiorari will not ordinarily lie unless there is a final determination of rights." *State ex. rel. Mosloski v. County of Martin*, 248 Minn. 503, 506, 80 N.W.2d 637, 639 (1957); *see also Mowry v. Young*, 565 N.W.2d 717, 719 (Minn.App. 1997), *review denied* (Minn. Sept. 18, 1997); *cf. Overseas Commodities Corp. v. Dockman*, 389 N.W.2d 254, 256 (Minn.App. 1986) (noting that "certiorari will not ordinarily lie unless the order is a final determination of the parties' rights, rather than an interlocutory or intermediate order" (citations omitted)). The hearing officer did not finally determine relator's rights under MURA until the amount of relator's relocation claims were determined after the second hearing.

■ We therefore conclude that certiorari appeals under MURA must be construed from the hearing officer's or other appointed agency official's final decision, and not from an acquiring authority's subsequent resolution. We also conclude that relator's rights under MURA were not

**6.** The Minnesota Administrative Procedure Act (APA) cannot apply because REDA does not have "statewide jurisdiction," Minn.Stat. § 14.02, subd. 2 (2000); *State by Archabal v. County of Hennepin*, 495 N.W.2d 416, 420 (Minn.1993), and the parties did not elect to be bound by the APA's appeal procedure. *See, e.g., Hard Times Café, Inc. v. City of*

*Minneapolis*, 625 N.W.2d 165, 173–74 (Minn. App.2001).

**7.** By so concluding, we adopt the reasoning found in *In re Application of Wax 'N Works for Relocation Benefits v. City of St. Paul*, No. C5-98-1602, 1999 WL 185174 (Minn.App. Apr. 6, 1999).

finally determined until the hearing officer made her decision concerning the amount of benefits. It therefore follows that the hearing officer's initial eligibility determination was not a final determination of relator's rights, and may be reviewed by this court on appeal.

## II.

Although REDA concedes that it initially used part of the MG & S property to accommodate the McDonald's project in the early 1990s, this project did not require relator to relocate its business. Consequently, REDA argues relator is not a "displaced person" under MURA because REDA's 1993 acquisition of the MG & S property did not directly result in the termination of relator's month-to-month lease in 1999. Relator responds that there is nothing in MURA that suggests a business is not entitled to relocation benefits if a certain amount of time elapses before it is required to vacate property.

Relocation benefits are available for any "displaced person," which is defined as

> any person who moves from real property, or moves personal property from real property, as a result of acquisition undertaken by an acquiring authority or as a result of voluntary rehabilitation carried out by a person pursuant to acquisition or as a consequence thereof.

Minn.Stat. § 117.50, subd. 3. "Acquisitions" include eminent domain actions and acquisitions by negotiation. Minn.Stat. § 117.50, subd. 4. There is no Minnesota case law analyzing this statutory definition. Under the federal act, "displaced person" is defined in both the United States Code

and in the Code of Federal Regulations. The federal act's definition, however, does not mirror the Minn.Stat. § 117.50, subd. 3 definition of "displaced person." [8]

■ The statutory provision in question here, Minn.Stat. § 117.50, subd. 3, is not technical and there is no consistent longstanding agency interpretation of the provision. *See, e.g., Lolling v. Midwest Patrol,* 545 N.W.2d 372, 375 (Minn.1996) (suggesting that where a statute is technical in nature, an agency's longstanding interpretation of the statutory language may be entitled some interpretive weight). Therefore, in considering this question of statutory interpretation and law, we are "not bound by the decision of the agency and need not defer to agency expertise." *St. Otto's Home v. Minn. Dep't of Human Servs.,* 437 N.W.2d 35, 39–40 (Minn.1989) (citations omitted); *see also Naegele,* 551 N.W.2d at 237 ("Certiorari * * * is certainly appropriate to review questions of law." (citation omitted)).

The hearing officer, in her June 5, 2000 decision, concluded that relator was a displaced person entitled to receive relocation benefits because REDA acquired the building in which relator was a tenant and REDA was an acquiring authority under Minn.Stat. § 117.50, subd. 5. The hearing officer also concluded that MG & S did not waive relator's right to relocation benefits in the 1992 purchase agreement with REDA.

■ It is undisputed that REDA purchased the property through negotiation. *See Gilliland v. Port Auth. of St. Paul,* 270 N.W.2d 743, 746 (Minn.1978) (stating that "acquisition" under MURA means to get

---

**8.** For example, the federal act defines "displaced person," in relevant part, as "any person who moves from real property, or moves his personal property from real property * * * as a *direct* result of * * * the acquisition of such real property in whole or in part for a

*program or project."* 42 U.S.C. § 4601(6)(A) (1994) (emphases added). The MURA definition of "displaced person" neither requires "direct" causation, nor does it require the acquisition be "for a program or project." *See* Minn.Stat. § 117.50, subds. 3, 4.

or obtain as one's own). REDA concedes that it needed part of the MG & S property to accommodate the McDonald's project and purchased the MG & S property to effect this purpose. The dispositive question, therefore, is whether relator's displacement six years later for a different project than was planned at the time of acquisition was "a result of acquisition undertaken by an acquiring authority." Minn.Stat. § 117.50, subd. 3.

██ We decline to construe MURA to mirror the federal act, which generally requires a displacement to be a direct result of an acquisition for a project or program. *See generally Alexander v. HUD,* 441 U.S. 39, 51–52, 99 S.Ct. 1572, 1581, 60 L.Ed.2d 28 (1979) (noting that there is "little doubt that Congress' concern was * * * with displacements caused by the acquisition of property for a Government program or project"); *Highway Pavers, Inc. v. Sec. of Interior,* 650 F.Supp. 559, 562 (1986) (suggesting "that the relocation or discontinuance of the business [must be] a direct result of the government acquiring the land upon which the business is located" (citation omitted)); *Day v. City of Dayton,* 604 F.Supp. 191, 197 (S.D.Ohio 1984) (noting that "for someone to be a displaced person, there must be some present nexus between a * * * program or project and the acquisition of that person's property").

We conclude that the MURA definition of "displaced person" should be construed to be broader than the federal act's definition because the MURA definition does not include "direct result" and "project or pro-

gram" requirements. *Cf. Beaty v. Imperial Irrigation Dist.,* 186 Cal.App.3d 897, 231 Cal.Rptr. 128, 136 (1986) (listing several states, including Minnesota, that have expressly adopted definitions of "displaced person" that are broader than the federal definition).[9]

The record suggests REDA's acquisition of the MG & S property in 1993 proceeded after several REDA meetings where redevelopment of the immediate area was at least discussed. The record does not suggest that REDA contemplated an immediate re-development of the entire area adjacent to and including the MG & S property in 1993. Although relator remained at the property for nearly six years after the acquisition, with the exception of the first year, relator never had more than a month-to-month lease. REDA contemplated additional redevelopment, and, ultimately terminated relator's month-to-month lease to proceed with this redevelopment. As California appellate courts have noted when interpreting California's similar relocation-assistance law:

> We cannot accept the [acquiring authority's] contention that its leasing of the property to [the displaced person] for an interim [six-year] period could change [a displaced person's entitlement to relocation assistance]. * * * To accept the [acquiring authority's] interpretation * * * would mean that the vast proportion of tenants who are required to move due to acquisition of real property for public use, would be ineligible for relocation benefits simply because they contin-

9. For general background material that discusses the federal act and the interplay between it and its state counterparts, see generally 27 Am.Jur.2d *Eminent Domain* §§ 942–1046 (1996 & Supp.2001); 7 Fed. Proc. *Relocation Assistance and Real–Property Acquisition Proceedings for Federal and Federally Funded Assisted Programs* §§ 14:326–439, at 483–544 (1991 & Supp.2001); James Timothy Payne, Annotation, *Validity, Construction, and Application of State Relocation Assistance Laws,* 49 A.L.R.4th 491 (1986); Catherine R. Lazuran, Annotation, *Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970,* 33 A.L.R. Fed. 9 (1977).

ued to rent from the [acquiring authority] in the interim.

*Superior Strut & Hanger Co. v. Port of Oakland,* 72 Cal.App.3d 987, 140 Cal.Rptr. 515, 519 (1977), *superseded by statute on other grounds, Melamed v. City of Long Beach,* 15 Cal.App.4th 70, 18 Cal.Rptr.2d 729 (1993); *cf. Albright v. State,* 101 Cal. App.3d 14, 161 Cal.Rptr. 317, 320–21 (1979).

Here, where there was temporary use of the acquiring authority's property by the relocation-benefits applicant and continuing efforts by the acquiring authority to redevelop the property, we conclude that relator is a displaced person under MURA and is entitled to relocation benefits because the relocation resulted from an acquisition. Nevertheless, we decline to adopt relator's argument that the passage of time and changed circumstances are irrelevant to a relator's status as a "displaced person," and that a "displaced person" has an indefinite, open-ended claim for relocation benefits. We leave for another day circumstances which might demonstrate that a particular relocation did not result from a chapter 117 acquisition.

### III.

After the hearing officer's initial determination that relator was entitled to relocation benefits as a "displaced person," REDA hired Conworth to assist relator in documenting its claims for relocation benefits. Conworth recommended relator be paid $11,433 for its moving expenses[10] and $1,000 for its replacement-site-search costs. Relator disputed this amount and the hearing to determine the proper amount of relator's claims was held.

■■■ Relator argues the hearing officer's decision to deny it relocation benefits in excess of $12,433 was arbitrary, oppressive, unreasonable, fraudulent, and decided under an erroneous theory of law. Relator argues the hearing officer's decision was unreasonable because it disregards certain costs incurred during Monk's inventory-liquidation sale and costs associated with storing its remaining property not liquidated at the sale. Relator also argues the hearing officer erred by denying relator payment in lieu of its actual cost claim.

On appeal, this court is to determine whether the agency kept within its jurisdiction and then decide whether the decision of the agency was arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of the law or without evidence to support it.

*In re Application of Wilkins Pontiac, Inc. for Relocation Benefits,* 530 N.W.2d 571, 574 (1995) (citing *Markwardt v. State Water Res. Bd.,* 254 N.W.2d 371, 374 (1977)), *review denied* (Minn. June 23, 1995).

We conclude the hearing officer's decision to deny relator relocation benefits for hypothetical storage costs was not arbitrary, oppressive, unreasonable, fraudulent, or decided under an erroneous theory of law. But we conclude the hearing officer's decision to deny relator relocation benefits for possible extraordinary advertising and administrative costs associated with the sale of its inventory at Monk's inventory-liquidation sale was unreasonable because such costs should be considered as actual costs of selling property not to be relocated. Therefore, we remand for additional proceedings to determine the reasonable amount of these costs, if any, and to determine whether relator is enti-

---

**10.** The $11,433 included $8,774 for the actual moving of relator's general personal property, $1,284 for the disconnection and removal of relator's alarm system, and $1,375 for the disconnection and removal of relator's telephone system.

tled to payment in lieu of its actual cost claim.

### A. Hypothetical Storage Costs

■■■ 49 C.F.R. § 24.303(a) (2000) provides that any "displaced person * * * is entitled to payment for such actual moving and related expenses, as the Agency determines to be reasonable and necessary." Expenses for the "[s]torage of * * * personal property for a period not to exceed 12 months, unless the Agency determines that a longer period is necessary," are reimbursable under the federal act. 49 C.F.R. § 24.303(a)(4). Nevertheless, a displaced person is not entitled to "[c]osts for storage of personal property on real property already owned or leased by the displaced person." 49 C.F.R. § 24.305(k) (2000).

The hearing officer concluded relator was not entitled to storage costs for the inventory not sold at Monk's inventory-liquidation sale because the unliquidated property was stored at the homes of family and friends. Therefore, because relator did not actually *incur* any costs by storing its property at these locations, the hearing officer concluded that these hypothetical storage costs were not "expenses incurred."

Relator's president admitted at the second hearing that he did not incur any actual storage costs by storing the unliquidated inventory at his home and at the homes of family and friends. The federal regulations ensure that an acquisition does not impose any *direct* financial costs on the property owner. Therefore, we conclude that the hearing officer's decision not to find REDA liable for relator's hypothetical storage costs was neither arbitrary nor unreasonable.

### B. Costs of Selling Inventory Not Relocated

■■■ "The reasonable cost incurred in attempting to sell an item that is not to be relocated" is also a reimbursable expense. 49 C.F.R. § 24.303(a)(11). "A displaced person is not entitled to payment for * * * [l]oss of profits," however. 49 C.F.R. § 24.305(d).

■■■ The hearing officer rejected relator's claim that it was entitled to reimbursement for certain costs associated with selling its inventory to Monk. The hearing officer found that the only actual cost in selling the inventory to Monk was incurred when relator obtained a going-out-of-business-sale license from the City of Robbinsdale. The hearing officer rejected relator's argument that it was required to pay a pro rata share of the costs associated with selling the inventory not to be relocated because the contract with Monk obligated Monk to absorb these costs. The hearing officer concluded that 49 C.F.R. § 24.303(a)(11) ensures assistance to displaced businesses attempting to relocate permanent fixture-type or immovable items, not inventory or office equipment, which can be relocated. The hearing officer also concluded that 49 C.F.R. § 24.305(d) provides that lost profits are not eligible moving expenses.

We first recognize that, contrary to the hearing officer's conclusion otherwise, there is no authority for the proposition that costs reimbursable under 49 C.F.R. § 24.303(a)(11) are limited to costs incurred to sell fixtures or other immovable items.

We also recognize that relator, no matter how it attempts to construe its agreement with Monk, *sold* its property to Monk as part of the inventory-liquidation sale. The hearing officer was technically correct that the only obvious identifiable cost of liquidating relator's inventory was

incurred when relator obtained the going-out-of-business-sale license. Relator is also correct, however, that Monk must have incurred certain advertising and administrative expenses when it conducted the sale. Elementary economic principles dictate that a rational, profit-maximizing business will not usually engage in commerce without the expectation of compensation. But it is unclear, based on the record, whether a share of these advertising and administrative expenses was imputed in the purchase price of the inventory relator sold to Monk (as relator apparently alleges), whether they were later paid by relator when a final accounting of the sale was conducted, or whether relator was liable for any of these expenses at all (as REDA alleges).

Therefore, we conclude that the hearing officer's decision not to address the actual advertising and administrative expenses possibly incurred by relator was unreasonable and we therefore remand for additional proceedings to determine the reasonable amount, if any, of these actual expenses.

We, however, do not adopt or endorse any particular method of calculating these apparent actual costs, including appellant's calculation methodology on appeal. Relator's total claim for expenses exceeds $130,000 and is more than half of what Monk paid relator for the inventory.[11] Moreover, the "sales-management fee" relator allegedly paid Monk to conduct the sale apparently constituted the remaining net profits from the sale, which indisput-ably included inventory solely owned by Monk and not involved in the present controversy in any way. Thus, it seems that this was not an actual cost incurred by relator because the net profits generated by Monk's unrelated inventory also contributed to this figure.

Therefore, whether any of these expenses claimed by relator are actually reasonable costs eligible for reimbursement cannot be determined on this record. We must reiterate, however, that on remand the hearing officer's inquiry should focus on those reasonable costs associated with selling relator's inventory on short-notice; for example, any extraordinary business expenses relator incurred by liquidating its inventory at the inventory-liquidation sale, above and beyond those expenses relator would have incurred by selling its remaining inventory in the ordinary course of business. *See* 49 C.F.R. § 24.1 (2000) (stating that the purpose of the federal act is to treat displaced persons "fairly, consistently, and equitably so that such persons will not suffer *disproportionate* injuries" (emphasis added)).

## C. *Payment–in–Lieu Claim*

■ If an agency determines certain criteria are present,

[a] displaced business may be eligible to choose a fixed payment in lieu of the payments for actual moving and related expenses, and actual reasonable reestablishment expenses * * *. Such fixed payment * * * shall equal the average

---

11. Indeed, if we were to accept relator's argument that it should be reimbursed for all of its claimed expenses associated with the inventory-liquidation sale, relator would reap a total windfall of $374,882.87. This windfall is calculated by adding together the amount Monk paid relator for its inventory ($191,820), relator's share of the net profits from the sale ($48,147.38), relator's claimed pro rata share of the advertising and administrative expenses ($87,461.22), and Monk's "sales-management fee" ($47,454.27). Relator's total windfall would result in a 95% profit over the inventory's $191,820 cost basis. This would be plainly unreasonable. Also, the amount of overdue rent relator owed REDA at the time of its displacement should be deducted from any damage award. *See* 49 C.F.R. § 24.207(f) (2000).

annual net earnings of the business * * * but not less than $1,000 nor more than $20,000.

49 C.F.R. § 24.306 (2000). A payment in lieu of an actual cost claim, however, is subject to several conditions precedent enumerated in 49 C.F.R. § 24.306(a)(1)-(6), (b).

The hearing officer did not make any findings or conclusions about whether relator was entitled to payment in lieu of its actual-cost claim, although relator did raise the issue through correspondence with REDA and at the second hearing. We cannot determine, based on the record before us, whether relator is entitled to payment in lieu of its actual-cost claim. *See Lickteig v. Iowa Dep't of Transp.,* 356 N.W.2d 205, 209–10 (Iowa 1984) (noting that a business seeking relocation benefits under Iowa and federal law "must [either] elect between an actual moving expense payment [or] an in lieu payment"). Indeed, it was not until the hearing officer made her second decision regarding the amount of benefits that relator recognized that a payment-in-lieu claim could result in greater compensation for its relocation costs. Therefore, we remand for further proceedings to allow the hearing officer to address relator's payment-in-lieu claim under 49 C.F.R. § 24.306.

### IV.

■ Relator argues that because the hearing officer was the city manager of a neighboring city and because the law firm representing REDA also represents that city, relator's procedural due-process rights were violated. Relator argues this conflict created a situation where REDA's "attorneys were arguing its case to one of its own clients." Relator objected to the hearing officer at the second hearing and the hearing officer admitted that she believed there was some conflict of interest. The hearing officer noted, however, that she did not interact with REDA's attorneys in this case; rather, she explained that she worked with other members of REDA's attorneys' firm.

49 C.F.R. § 24.10(a) provides that appeals should be reviewed "in accordance with the requirements of applicable law and this part."

> In deciding an appeal, the Agency shall consider all pertinent justification and other material submitted by the person, and all other available information that is needed to ensure a fair and full review of the appeal.

49 C.F.R. § 24.10(f). The only additional requirement under the federal regulations is that the "official [conducting the appeal] shall not have been directly involved in the action appealed." 49 C.F.R. § 24.10(h).

■ Constitutional procedural due-process protections protect an individual who is deprived of a property interest.

> These protections include reasonable notice, a timely opportunity for a hearing, the right to be represented by counsel, an opportunity to present evidence and argument, the right to an impartial decisionmaker, and the right to a reasonable decision based solely on the record.

*Humenansky v. Minn. Bd. of Med. Exam'rs,* 525 N.W.2d 559, 565 (Minn.App. 1994) (citation omitted), *review denied* (Minn. Feb. 14, 1995); *see also CUP Foods, Inc. v. City of Minneapolis,* 633 N.W.2d 557, 562–63 (Minn.App.2001), *review denied* (Minn. Nov. 13, 2001).

Relator's objection to the hearing officer at the second hearing apparently arose from relator's belief that the hearing officer was biased against relator because she noted in her initial eligibility determination that "it is * * * apparent to me that [relator] is taking advantage of a situation in which REDA acted in good faith, but failed

to follow the letter of the law." This statement was made, however, after the hearing officer decided that relator *was* a displaced person under MURA. The hearing officer's comments detailed the factual history of the case, including the fact that relator and MG & S were initially treated, perhaps innocently and justifiably, as interchangeable business entities by REDA. A thorough review of the record suggests the hearing officer made every attempt to understand the admittedly confusing sequence of events in this case and attempted to fairly apply equally confusing relocation-benefits law to those facts.

We conclude relator's procedural due-process rights were not violated by the hearing officer's conflict of interest (if any) in this case. We direct REDA, however, to appoint a different hearing officer or agency official to conduct the additional proceedings on remand.

As a final matter, we also should note that on several occasions throughout the proceedings and on appeal before this court, relator claimed that REDA was acting in bad faith by denying relator relocation benefits. Not only are these bad-faith allegations unsupported by the record, they border on the absurd. MURA is hardly a model of legislative clarity, and has only been infrequently interpreted by Minnesota appellate courts. REDA's legal arguments were clearly not frivolous and were not inconsistent with either state or federal law.

## DECISION

Under MURA, certiorari appeals to this court must be construed from a hearing officer's or other agency official's final decision, and not a subsequent agency action. Relator is a displaced person under MURA because it was displaced as a result of an acquisition by REDA. It was reasonable for the hearing officer to conclude that hypothetical storage costs that were not actually incurred by relator were not reimbursable under MURA. The hearing officer's decision that advertising and other administrative costs that were possibly incurred by relator as part of the inventory-liquidation sale were not reimbursable was unreasonable. Therefore, remand is appropriate for a different hearing officer to determine the proper amount of these extraordinary costs, if any. Remand proceedings should also address relator's payment-in-lieu claim.

**Reversed and remanded.**