699 N.W.2d 758 (2005)
In the Matter of the Kenneth WREN Residential Relocation Claim.
The Housing and Redevelopment Authority in and for the City of Richfield, a public body corporate and politic under Minnesota law, Appellant,
v.
Kenneth Wren, Respondent.
No. A04-207.
Supreme Court of Minnesota.
July 28, 2005.
*759 James J. Thomson, Robert J.V. Vose, Kennedy & Graven, Chartered, Minneapolis, MN, for Appellant.
Jon W. Morphew, Schnitker & Associates, P.A., Minneapolis, MN, for Respondent Kenneth Wren.
David Allan Davenport, Winthorp & Weinstine, P.A., Minneapolis MN, for Intervener Lyndale Gateway LLC.
Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for Amicus Curiae League of Minnesota Cities.
Heard, considered, and decided by the court en banc.

OPINION
HANSON, Justice.
Appellant Richfield Housing and Redevelopment Authority (HRA) appeals from an administrative order directing it to pay relocation benefits to respondent Kenneth Wren pursuant to the Minnesota Uniform Relocation Act (MURA), Minn.Stat. §§ 117.50-117.56 (2002). The HRA contends that it should not be liable to pay the benefits because it contracted with a private developer to negotiate with Wren for the purchase of his home. The Administrative Law Judge concluded that the HRA had "undertaken acquisition" of Wren's property within the meaning of *760 MURA and held that Wren was entitled to relocation benefits. The court of appeals affirmed. In re Wren, 685 N.W.2d 721, 725 (Minn.App.2004). We affirm the decision of the court of appeals.
In 1993, the City of Richfield through its HRA began efforts to redevelop a "blighted and substandard" area on the 7600 blocks of Lyndale, Aldrich, and Garfield Avenues South. The redevelopment project eventually became known as "Lyndale Gateway West." In January 1999, the HRA contracted with CSM Properties, Inc. to redevelop the area with a mixture of residential, retail, and office structures. By letter, the HRA informed area property owners about the contract and that there would be a process to address property-owner inquiries about "the purchase of their home."
In November 1999, Wren purchased a residence at 7627 Aldrich Avenue South for $116,900, without actual knowledge that the property was within the redevelopment boundaries. Shortly after moving in, Wren received a postcard about a city council meeting where the redevelopment plans were to be discussed. He attended the meeting and later received "general information" about the time line for the project.
The HRA terminated its contract with CSM Properties in May 2001 and sought another developer. In August 2002, the HRA approved a contract with Cornerstone Group, which in turn created Lyndale Gateway, LLC, to acquire property for the project. The "Contract for Private Development" between the HRA and Lyndale Gateway specified that Lyndale Gateway was to "diligently pursue" property acquisitions through negotiation. If those negotiations failed, Lyndale Gateway could ask the HRA to "undertake condemnation" and HRA agreed that it would "in good faith, * * * undertake the steps necessary to acquire fee simple title to the portions of the Property to which the request relates." All properties acquired by the HRA through condemnation would be conveyed to Lyndale Gateway. Lyndale Gateway was "responsible for all acquisition costs and the cost of relocation benefits and assistance provided to any party displaced as a result of the development."
In 2002, the City of Richfield established a Tax Increment Financing (TIF) district to finance the project.[1] In July 2002, a real estate broker hired by Cornerstone Group contacted Wren to discuss the purchase of his property. Ultimately, the broker mailed a purchase agreement to Wren for the purchase of Wren's home by Lyndale Gateway for $170,000. The purchase agreement gave notice that there was a "dual agency" arrangement and, pursuant to Minn.Stat. § 82.197, subd. 2 (2004), disclosed that the broker owed fiduciary duties to both the buyer and seller. The purchase agreement's addendum specified that the seller was waiving any claim to relocation benefits.[2]
*761 Wren negotiated a $10,000 increase to the purchase price. The broker testified at an administrative hearing that "Mr. Wren felt that he should be getting more money in order to move." Ultimately, the parties signed the purchase agreement and addendum, with a sale price of $180,000. Wren closed on the sale of his property on June 5, 2003, and moved the same day. Shortly thereafter, he claimed relocation benefits from the HRA.
The HRA sought an administrative hearing pursuant to Minn.Stat. § 14.55 (2004)[3] to challenge its liability to pay the benefits, and Lyndale Gateway's petition to intervene was granted. The administrative law judge ruled that Wren was entitled to relocation benefits because (1) he was a "displaced person" within the meaning of the statute, (2) the city had "undertaken" acquisition of Wren's property because "the record demonstrates a significant element of involvement and control by the HRA in this redevelopment effort," and (3) Wren's waiver of relocation benefits was ineffective because the HRA failed to meet its statutory duty to provide Wren with information on the benefits. See Minn.Stat. § 117.521, subd. 1 (2004). In his memorandum, the ALJ concluded:
Where an HRA selects a private developer to engage in direct negotiations with property owners it should not be relieved of the requirements of the statute where it remains the moving force behind redevelopment, that is, where it "undertakes" the acquisition of property for redevelopment. To do so would frustrate the beneficial purpose, including the specific notice requirements, set out in MURA and the federal law.
The ALJ also denied the HRA's petition for reconsideration.
On appeal by writ of certiorari, the court of appeals affirmed, holding that the HRA's "significant role" in the project supported the ALJ's conclusion that the HRA had "undertaken" acquisition of the property. In re Wren, 685 N.W.2d at 725. Because the HRA did not challenge the ALJ's ruling that Wren's waiver of relocation benefits was ineffective, the court of appeals did not address that issue. We granted the HRA's petition for review of the issue of whether the acquisition of Wren's property had been "undertaken" by the HRA, within the meaning of MURA.

I.
Statutory interpretation is a question of law reviewed de novo without deference to an administrative decision. In re Denial of Eller Media Co.'s Applications for Outdoor Advertising Device Permits, 664 N.W.2d 1, 7 (Minn.2003). When reviewing an administrative law judge's findings of fact, we determine whether they are "[u]nsupported by substantial evidence in view of the entire record as submitted." Minn.Stat. § 14.69(e) (2004).
The MURA provision for relocation benefits reads in relevant part:
In all acquisitions undertaken by any acquiring authority and in all voluntary rehabilitation carried out by a person pursuant to acquisition or as a consequence thereof, * * * the acquiring authority, as a cost of acquisition, shall provide all relocation assistance, services, payments and benefits required by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 * * *.
*762 Minn.Stat. § 117.52, subd. 1 (2004).[4] MURA specifies that "acquisition" includes "(a) acquisition by eminent domain; (b) acquisition by negotiation; (c) programs of area wide systematic housing code enforcement; and (d) demolition." Minn.Stat. § 117.50, subd. 4 (2004). MURA does not specify how an acquisition is "undertaken." An "acquiring authority" includes "(a) the state and every public and private body and agency thereof which has the power of eminent domain; and (b) any acquiring authority carrying out an areawide systematic housing code enforcement program." Minn.Stat. § 117.50, subd. 5 (2004).
We have addressed the meaning of "acquisition" under MURA once before. In Gilliland v. Port Authority of St. Paul, we held that no "acquisition" had taken place when a hotel owner sought and received revenue bond financing from the Port Authority even though the owner conveyed fee simple title of the hotel to the Port Authority, which contemporaneously leased the property back to the owner. 270 N.W.2d 743, 746-47 (Minn.1978). Because the Port Authority had "no power to possess the hotel or to use it for its own purposes," and because title to the property reverted to the redeveloper upon the expiration of the lease, we held that the Port Authority had not "acquired" the hotel and thus was not liable to pay relocation benefits to displaced tenants. Id. at 747. We characterized the sale-leaseback arrangement as "purely a financing arrangement." Id.
The HRA contends that Gilliland controls our analysis, arguing that both that project and the Lyndale Gateway redevelopment were private efforts and that the only municipal involvement regarded funding. The HRA argues that Wren's claim is even weaker than the claim in Gilliland because the HRA never took legal title to Wren's home. But in Gilliland the project was initiated by the hotel owner, not the Port Authority, and the Port Authority did not select the developer or control by contract the developer's actions, did not encourage the tenants to negotiate with the hotel owner, and was not contractually bound to acquire the property by eminent domain. In fact, neither party in Gilliland made an "acquisition." The development project involved the rehabilitation of property by its present owner.[5] The private developer already owned the hotel and did not need to acquire it. The only question in Gilliland was whether the transfer of bare legal title to the Port Authority, as part of a financing mechanism, constituted an "acquisition" by the Port Authority from the developer, within the contemplation of MURA. We held that it did not.
Here, by contrast, neither the HRA nor the developer owned the property that was to be redeveloped and thus the redevelopment project could not proceed unless the property was acquired from third-party *763 owners, either by the developer, the HRA, or the two jointly. Because Gilliland did not involve any acquisition, and the Lyndale Gateway project was premised on the successful completion of several acquisitions, we conclude that Gilliland does not control our analysis. There is no question that private property was acquired in this case; the question is by whom the acquisition was "undertaken."

II.
The term "undertaken" is not defined by MURA. The ALJ and court of appeals cited dictionary definitions of the word, as to "take upon oneself," "commit oneself," or "begin." In re Wren, 685 N.W.2d at 724; see also Minn.Stat. § 645.08(1) (2004) (stating that statutory nontechnical words and phrases are to be construed according to "common and approved usage"). The ALJ held that the HRA had undertaken acquisition of Wren's property because the agency had exercised "a significant element of involvement and control," and was the "moving force behind redevelopment." Similarly, the court of appeals held that the HRA had a "significant role" in the project by initiating, fostering, and financing the redevelopment, by communicating with property owners and renters, and by agreeing to use its power of eminent domain if necessary. In re Wren, 685 N.W.2d at 725.
The HRA contends that "nothing in MURA or its legislative history" supports the conclusion that relocation benefits should depend on whether an acquiring authority was "significantly involved" in a given acquisition. The HRA argues that MURA and Gilliland create a bright-line standard whereby the words "acquisition undertaken by" apply only where the acquiring authority "(a) comes into possession or control of private property; (b) has the power of disposal over private property; or (c) treats property as its own." But, again, this argument relies on an interpretation of the word "acquisition" that has no application here, and also fails to give meaning to the word "undertaken."
We do not find the legislative history of MURA to be particularly informative on the meaning of the word "undertaken." We do note that MURA, when enacted in 1973, made some changes in the law concerning relocation benefits, but those changes were minor and represent a slight broadening, not narrowing, of the benefits.[6] We also note that the Minnesota legislature did not adopt the even broader changes made to the federal URA in 1987. The federal URA now provides for benefits "[w]henever a program or project to be undertaken by a displacing agency will result in the displacement of any person." Pub.L. No. 100-17, § 405(a)(1); 42 U.S.C. § 4622(a) (2003) (emphasis added).[7] But the Minnesota legislature's failure to adopt *764 the federal language is equivocal at best. We have no way of determining whether that failure should be interpreted as a rejection of the broader federal rule, as the HRA argues; or as a determination that the federal changes were unnecessary as superfluous.[8]
Both parties refer us to the decision of the federal Court of Appeals for the Eighth Circuit in Young v. Harris, 599 F.2d 870 (8th Cir.1979). Although that decision was made under the federal URA and is not binding on our interpretation of MURA, we find it useful in developing a standard for determining when a city has undertaken an acquisition even though the acquisition is more directly accomplished by the city's developer. The court in Young considered whether activities of the private developer and the city were "sufficiently intertwined" to characterize them as a joint undertaking. 599 F.2d at 877. We conclude that this is the appropriate standard because it focuses on the substance and not just the form of the acquisitions and is consistent with the remedial purposes of MURA. This standard is perhaps similar to the "significant involvement" standard that the court of appeals used, but it more directly focuses on the quality, not just quantity, of the respective activities of the city and its developer, and how essential the activities of each are to the successful acquisition of the property to be redeveloped.

III.
Young is also instructive when we examine its application to the facts there presented. Some of those facts are similar to the facts herethe city identified an area for redevelopment; the city approved a development plan, selected a private developer and made a contract with the developer; the city agreed to provide municipal services to the development project; and the private developer undertook direct negotiations with the property owners. Id. at 873-75. But, unlike our facts, the city did not provide financial assistance and the city did not obligate itself to use its eminent domain power to acquire property that the developer could not acquire by negotiation.[9] Also, the opinion in Young does not suggest that the city actively contacted property owners or used its influence to encourage property owners to deal with the developer.
The most important factor in the analysis of our facts is the HRA's contractual obligation to use its eminent domain powers to acquire Wren's property should private negotiations have failed. The HRA argues that, despite the contract, the HRA could have elected not to initiate condemnation proceedings should Lyndale Gateway's negotiations with Wren have been unsuccessful. The HRA argues that it has never used its eminent domain power to condemn a single-family residence. *765 But this argument is not supported by the HRA's contract with the developer, which provides no exception for single-family residences. Thus, if Wren's property had not been acquired through negotiation and the developer had satisfied all other conditions, the HRA would have been required to either undertake condemnation proceedings or breach its contract obligation to "in good faith, * * * undertake the steps necessary to acquire fee simple title."[10]
Moreover, we cannot ignore the effect that the HRA's promise to condemn necessarily had on the developer's negotiations with Wren. The HRA's frequent and direct communications with property owners made it clear that the developer was acting under contract with the HRA to acquire property within a development district that the HRA had identified and established. The HRA further encouraged property owners to deal with the developer. Property owners could fairly conclude that they could not refuse to sell, and that if they did not agree to a negotiated price, that price would be determined through a condemnation proceeding. Thus, the HRA's power to condemn inevitably influenced Wren's negotiations with the developer.
Further, the HRA actively used its position of trust with property owners to encourage their dealings with the developer. By initiating the project, controlling the developer, encouraging property owners to negotiate with the developer, providing financing to make the purchase possible and, most importantly, assuring the developer that the HRA's power of condemnation was available to impose limits on the private negotiations, the HRA became an important "partner" in the acquisition, which in a real sense was jointly "undertaken" by the HRA and the developer. In other words, the fact that the developer had undertaken the acquisition does not exclude the HRA from the joint undertaking. Instead, the activities that were considered at the outset to be important to a successful redevelopment project were divided between the HRA and Lyndale Gateway, and each was bound to the other to perform its activity for the benefit of the project. Unlike in Young, the HRA did not delegate all important activities to the private developer, but retained responsibility for activities that were important to the ultimate success of the project. This division of roles presented a sufficient intertwining of activities to conclude that the acquisition of Wren's property was jointly undertaken by the HRA and Lyndale Gateway.
Accordingly, the HRA is liable to pay relocation benefits to Wren.[11]
Affirmed.
*766 ANDERSON, G. BARRY, J. (dissenting).
I respectfully dissent.
I agree with the majority that, here, the issue presented is not whether private property was acquired, but by whom the acquisition was "undertaken." Because I conclude that the HRA did not undertake this acquisition within the meaning of the controlling statute, I would reverse the court of appeals.
It is important to first note that the question presented is a matter of statutory interpretation and the parties do not argue, and we do not reach, any constitutional issues that might normally be associated with eminent domain actions. As a matter of policy, the federal government, and most states, provide compensation, known generally as "relocation benefits," to those property owners required to move homes and businesses as a result of the exercise of constitutional eminent domain authority and those benefits are the focus of this appeal.
The Minnesota version of this statutory authority for relocation benefits is found at Minn.Stat. § 117.52, subd. 1 (2004), which provides eligibility for relocation benefits in all acquisitions "undertaken by any acquiring authority and in all voluntary rehabilitation carried out by a person pursuant to acquisition or as a consequence thereof."
But what is most significant about the Minnesota statute is that it is extremely narrow in comparison to the federal statute governing the award of relocation benefits; indeed, as the majority opinion recognizes, the Minnesota statute is unique. By operation of federal law, federal relocation benefits are provided "[w]henever a program or project to be undertaken by a displacing agency will result in the displacement of any person." Pub.L. No. 100-17, § 405(a)(1); 42 U.S.C. § 4622(a) (2003) (emphasis added). The broad and inclusive references to "program" and "project" in the federal statute, and many state statutes, are absent from the Minnesota version. In my view, the specific statutory language chosen by the Minnesota legislature requiring an "acquiring authority" to "undertake" an acquisition is sufficient to conclude that no relocation benefits are awardable in the present dispute.
While not directly controlling, as the majority properly recognizes, our prior decision in Gilliland v. Port Authority of St. Paul, 270 N.W.2d 743 (Minn.1978), provides additional support for the conclusion that relocation benefits are not properly awardable here. The Gilliland court, in examining the definition of acquisition in connection with eminent domain principles, viewed "acquisition" as meaning to actually "obtain." Id. at 746. Gilliland is of only marginal utility here, given the factual differences between Gilliland and the present dispute, but at a minimum, Gilliland suggests that Minn.Stat. § 117.50, subd. 4(b), should be read narrowly.[12]
The narrow statutory language, the limited guidance provided by Gilliland and the failure of the legislature to change the definition at issue here in the intervening decades all support the conclusion that the *767 HRA never undertook the acquisition of the Wren property and thus the HRA has no liability for relocation benefits here. Whether viewed in the light of the "obtain" language used by the Gilliland court, or a possession or control of the property test, or some other formulation, the HRA never had the requisite legal interest in the property to acquire Wren's property in the sense required by statute. The majority opinion decides differently, however, at least in part, and awards relocation benefits because it concludes the HRA was contractually obligated to use eminent domain to acquire property that the developer could not acquire by negotiation, including the property owned by Wren.
The majority's argument rests essentially on one line of the agreement between the HRA and the developer found at section 3.2(b) of the contract where the HRA agrees to "undertake the steps necessary to acquire fee simple title to the portions of the property to which the request relates." But that phrase must be viewed in conjunction with other provisions in the contract which tend to weaken the argument that the HRA had a contractual obligation to acquire Wren's property if no deal could be reached between Wren and the developer.
The "request" referred to in section 3.2(b) that the developer is authorized to make is described in section 3.2(a)(7) of the contract. Significantly, the section 3.2(a)(7) provision, which authorizes the developer to request that the city use its eminent domain authority, contains numerous preconditions before it becomes legally binding. The administrative law judge made no finding that all of those preconditions had been met. Additionally, the HRA argues, and the administrative law judge found, that the city had never acquired a residential property in these circumstances, and the HRA further argues that it would not have done so had the developer made such a request. Indeed, the record demonstrates that the only request made by the developer to the city for condemnation concerned commercial properties. There is no evidence, by affidavit or otherwise, that the developer understood that it had the right to request that the city condemn, and take title to, residential property.
Further, whatever contractual duties the HRA might have with respect to condemnation, section 3.1 expressly limits those duties to an obligation to "proceed in good faith and to utilize its best efforts." The contract and the record before us are decidedly unhelpful in unraveling what "best efforts" might mean.
Wren argues persuasively that the HRA would be unlikely to walk away from this large redevelopment project because of an unwillingness to condemn residential property. But Wren is not a party to the contract, and his argument is essentially speculation about a decision elected officials might or might not make. And what are we to make of the ALJ's memorandum in connection with a petition for reconsideration, in which the ALJ, in rejecting that petition, noted that the findings did not "reject some possibility that the HRA would refuse to condemn Mr. Wren's home"? There is some factual uncertainty which this court has now resolved without the benefit of trial, evidence, or even a summary judgment proceeding involving the two parties to the contract.
My point is not to debate the relative merits of these arguments but to simply illustrate that countervailing arguments do exist and might have been presented if the HRA and developer found themselves at cross purposes over whether the HRA was obligated to exercise its eminent domain authority with respect to residential property.
*768 Whether intentionally or inadvertently obfuscatory, it can hardly be said that, as a matter of law, the HRA was "contractually obligated" to commence eminent domain proceedings here in connection with the Wren residential property. And that is precisely the conclusion the majority opinion reaches. And absent the contractual requirement to condemn the Wren property, there is no link between the HRA and the developer establishing that the HRA "undertook" an acquisition of the Wren property.
Finally, I turn to the logical consequences of the majority opinion. The court of appeals used a standard of "significant involvement" to hook the HRA with the developer such that municipal liability for relocation benefits was created while the majority opinion, using language found in Young v. Harris, 599 F.2d 870 (8th Cir.1979), focused instead on a standard centered around whether the activities of the private developer and the city were "sufficiently intertwined" to characterize those activities as a joint undertaking. Regardless of which standard is used, either standard ignores the reality of redevelopment projects.
The procedures used by the HRA in this development project were not unusual. There is not a shred of evidence anywhere in the record that any residential property owner received any correspondence or communication from the city threatening or even suggesting the possible use of eminent domain. Indeed, letters from the city encouraged cooperation with the developer but also warn of problems with financing the project. The logical reaction of municipalities and other acquiring agencies to the majority opinion is to quit informing residents of activity occurring in connection with redevelopment projects.[13]
The majority, in its effort to support the argument that there was a joint project here, recites a litany of facts including that the city identified the area for redevelopment, approved the development plan, selected a private developer, entered into a contract with the developer and agreed to provide municipal services to the project.
It is hard to conceive, however, of any municipal redevelopment project which would not share these features. The logical conclusion of the majority opinion is that any redevelopment project with municipal sponsorship must now bear responsibility for all relocation benefits regardless of who actually acquired the property. This may be good public policy but it is not public policy required by statute.
Wren argues persuasively that relocation benefits should be payable to residential property owners under these circumstances and also argues that to hold otherwise is to encourage municipalities to avoid liability for relocation benefits. But, regardless of the merits of Wren's argument, the scope of relocation benefits is a contested public policy issue for the legislature to address, not this court.
*769 For all of these reasons, I respectfully dissent.
NOTES
[1] The record does not specify the precise nature of this TIF funding, but indicates that the city reimbursed the redeveloper for some of its costs.
[2] The pertinent portion of the paragraph read:

Seller acknowledges that this is a voluntary and arm's length transaction between Buyer and Seller, and that the purchase price has been established through negotiation and represents the total amount that will be due and payable to Seller by reason of this transaction. Seller specifically acknowledges and agrees that neither Buyer nor the City of Richfield shall have any obligation to pay or provide to Seller, any relocation assistance, services, payments or benefits. Additionally, Seller expressly waives any claim to relocation assistance, services, benefits or payments.
[3] Section 14.55 authorizes a political subdivision to contract with the state's chief administrative law judge to hear such matters.
[4] Minnesota Statutes § 117.52, subd. 1, applies when, as here, federal relocation assistance under the Uniform Relocation Assistance and Real Property Acquisition Policies Act, 42 U.S.C. §§ 4601-4655 (2003) (URA), is not available because there is no federal financial participation. MURA incorporates URA standards as to the types of benefits that an acquiring authority must provide. Benefits generally include actual moving expenses, compensation for property losses, and expenses related to finding replacement business property. See 42 U.S.C. § 4622(a) (2003). The 2002 version of MURA applies to this case.
[5] See, e.g., Young v. Harris, 599 F.2d 870, 876 n. 9 (8th Cir.1979) (concluding that displacements caused by rehabilitation of property by its present owner are not covered by the federal Uniform Relocation Assistance and Real Property Acquisition Act of 1970 because they did not result from an acquisition).
[6] The predecessor statute referred to acquisitions "instituted" instead of acquisitions "undertaken" and limited liability for relocation benefits to acquisitions "by eminent domain or by negotiation." Minn.Stat. § 117.095 (1971). MURA expanded relocation benefits to acquisition by "demolition" and "programs of areawide systematic housing code enforcement." Minn.Stat. § 117.50, subd. 4(c)-(d). This broadening of MURA weakens the HRA's argument that liability for relocation benefits arises only when the authority "has the power of disposal over private property" or "treats property as its own," since the authority would attain no such rights through housing-code enforcement.
[7] Several states have statutes identical or similar to the federal URA. Cal. Gov.Code § 7262(a) (2004); Colo.Rev.Stat. Ann. § 24-56-103(1) (2004); Mo.Rev.Stat. § 305.603 (2004); Neb.Rev.Stat. § 76-1228 (2004); N.H.Rev.Stat. Ann. § 124-A:3(I) (2004); N.D. Cent.Code 54-01.1-03 (2004); Tenn.Code Ann. 13-11-105(a) (2004); Wash. Rev.Code. Ann. 8.26.035(1) (2004). Minnesota's statute appears to be unique.
[8] The HRA also argues that the legislature's reaction to the court of appeals' decision in James Brothers signals a general intent for MURA to mirror URA. See In re Relocation Benefits of James Bros. Furniture, Inc., 642 N.W.2d 91, 99 (Minn.App.2002). In 2003, the legislature amended the state definition of "displaced person" to "correspond to federal law," in apparent response to a court of appeals decision that concluded that the term "should be construed to be broader than the federal act's definition." Act of May 23, 2003, ch. 117, § 1, 2003 Minn. Laws 688, 688-89 (codified at Minn.Stat. § 117.50, subd. 3 (2004)); James Bros., 642 N.W.2d at 99. Had the legislature intended for MURA to more broadly mirror URA, presumably the legislature would have taken steps to accomplish this.
[9] Under the Missouri Urban Redevelopment Corporation Law, the city was authorized to grant the powers of eminent domain to the developer. Young, 599 F.2d at 873-74.
[10] That the HRA was bound only to act in "good faith" is of little consequence because "[u]nder Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not `unjustifiably hinder' the other party's performance of the contract." In re Hennepin County 1986 Recycling Bond Litigation, 540 N.W.2d 494, 502 (Minn.1995).
[11] The HRA argues that Wren, as part of an "arm's length" transaction, negotiated a price $10,000 higher than the initial offer to compensate him for his moving expenses. We are unwilling to characterize the transaction as one at "arm's length" because of the "dual agency" arrangement. There is no indication that the broker satisfied his fiduciary duty of informing Wren about the type and amounts of relocation benefits that might be available. Further, the HRA has not challenged the ALJ's determination that Wren's waiver of relocation benefits was ineffective. Under Minn.Stat. § 117.521, subd. 1 (2004), a party may voluntarily waive relocation assistance by signing a waiver "specifically describing" the types and amounts of assistance available and "stating that the agreement is voluntary and not made under any threat of acquisition by eminent domain."
[12] Gilliland also supports the proposition that we read MURA in light of the corresponding federal statute to discern legislative intent. There, we noted that "[t]he Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C.A. § 4601, et seq., MURAs Federal counterpart, provides assistance to those displaced by Federally financed state projects." 270 N.W.2d at 747. Thus, "[f]rom the legislatures failure to include such a provision in the [MURA] statute," we concluded "that relocation assistance is not available where the governmental action causing displacement is solely the financing of a private rehabilitation project." Id.
[13] Indeed, we have previously criticized municipalities for failing to do what the HRA has done hereto keep residents abreast of redevelopment activities. In Johnson v. City of Minneapolis, we criticized Minneapolis in connection with a downtown development project because property owners "were not informed that the City was not obligated to proceed with the development under the agreement with [the developer], were not apprised of the status of the development project, and were not informed when the * * * project was effectively abandoned." 667 N.W.2d 109, 116 (Minn.2003). Thus, we agreed with the district court's conclusion that the city "misled the appellants by their words, actions, and inactions * * * leading [appellants] to believe that the acquisition was going forward." Id. (citation omitted).