**In the Matter of JENSEN FIELD RELOCATION CLAIMS JENSEN FIELD, INC., et al., Relators,**

v.

**The Board of Regents of the University of Minnesota, Respondent.**

**No. A11–1942.**

Court of Appeals of Minnesota.

June 25, 2012.

Kirk Schnitker, Jon W. Morphew, Schnitker Law Office, P.A., Spring Lake Park, MN, for relators.

Mark B. Rotenberg, General Counsel, Jennifer L. Frisch, Associate General Counsel, Minneapolis, MN, for respondent.

Considered and decided by SCHELLHAS, Presiding Judge; BJORKMAN, Judge; and LARKIN, Judge.

## OPINION

SCHELLHAS, Judge.

In this certiorari appeal, involving a dispute about whether relators-tenants are eligible for relocation benefits under the URA, relators argue that (1) the use by respondent-landlord of one of its vice presidents to serve as the hearing officer violated Minn.Stat. §§ 117.012, subd. 1, 117.52, subd. 4; (2) they are displaced persons and therefore entitled to relocation benefits under the URA; (3) the hearing officer erred by concurrently determining their eligibility for and the amount of relocation benefits; and (4) the hearing officer erred by denying them relocation benefits. We conclude that respondent did not violate sections 117.012, subdivision 1, or 117.52, subdivision 4, by using one of its vice presidents to serve as a hearing officer, and that respondent did not err by concurrently determining relators' eligibility for and the amount of relocation benefits. But, because we conclude that the hearing officer's determinations that relators are not displaced persons under the URA and that they are not entitled to relocation benefits are not supported by evidence in the record and were affected by an error of law, we reverse the decision of the hearing officer.

## FACTS

In 1947 and 1948, respondent Board of Regents of the University of Minnesota (the university) purchased an 8,000-acre parcel of land from the federal government (UMore Park). In 1986, the university entered into a five-year lease of approximately eight acres in UMore Park to relator Jensen Field Inc. for Jensen Field's operation of a non-assignable private airport. Upon its expiration or termination, the lease required that Jensen Field "re-move its personal property and any improvements constructed on the [property] by it or its sublessees (hangars, cement floors, etc.) and return the land to the condition which existed at commencement of its use of the premises...." The lease contained an optional two-year extension that ran in favor of Jensen Field. In 1991, the university and Jensen Field entered into a two-year extension and, from 1993 to 2009, entered into one-year lease extensions.

Beginning in 1996, the university denied Jensen Field's annual requests to extend the lease for more than one year. In a letter, dated November 17, 2009, the university noted that Jensen Field's lease expired on October 31, 2009; declined Jensen Field's request for a five-year lease extension; offered Jensen Field a one-year extension to October 31, 2010; and notified Jensen Field that the university could not extend the lease beyond October 31, 2010, noting:

> With the University's recent receipt of notice of a U.S. Department of Energy award of up to $8 million in federal stimulus funds for a research project at UMore Park involving wind energy, we expect the University will begin constructing a wind turbine (the turbine is already ordered, expected useful life of 10–20 years) at UMore Park this coming spring/summer, with its operation then scheduled to begin by the fall of 2010. Therefore the University is unable to continue this lease after October 31, 2010.

The university also informed Jensen Field that it must remove its personal property and any improvements constructed by it or its sublessees and return the land to the condition it was in when the lease began. When Jensen Field received the letter, 13

airplane hangars, owned by 10 individuals,[1] were located at the airfield, and Jensen Field was current on its rent payments.

On January 15, 2010, the university received the United States Department of Energy grant, which required the university to "comply with application provisions of 49 CFR part 24, which implements the [URA]." In July 2010, relators informed the university that they would seek relocation benefits under the URA and requested that the university provide them with advisory services and claim assistance. In August 2010, at relators' request, All Furniture Inc. conducted a walkthrough of the airfield and provided relators with an estimate for moving personal property, equipment, and airplanes. By October 31, 2010, relators had moved, sold, or otherwise disposed of 12 of their 13 airplane hangars and their personal property, equipment, and airplanes.

In February 2011, the university rejected relators' claims for relocation benefits, noting that they were not displaced persons and that they failed to submit proof of entitlement to a claim. Relators subsequently sought an administrative appeal hearing, and University of Minnesota President Robert H. Bruininks appointed Vice President for University Services Kathleen O'Brien to "conduct appropriate proceedings to make a final determination of the claims." On September 15, 2011, Vice President O'Brien issued findings of fact, conclusions, and an order, ruling that relators were not displaced persons under the URA and that they did not provide adequate documentation necessary to entitle them to relocation benefits, and denying their claims for benefits.

This appeal by writ of certiorari follows.

1. The individual owners, along with Jensen Field, are hereafter collectively referred to as relators.

## ISSUES

I. Did the university violate Minn.Stat. §§ 117.012, subd. 1, 117.52, subd. 4, by appointing Vice President O'Brien to serve as the hearing officer?

II. Are relators "displaced person[s]" under the URA?

III. Are relators entitled to relocation benefits under the URA?

## ANALYSIS

"[C]ourts must be reluctant to invade the sphere of authority reserved to the [University Board of] [R]egents by our constitution." *Bailey v. Univ. of Minn.*, 290 Minn. 359, 361, 187 N.W.2d 702, 704 (Minn.1971). The university's "autonomy is derived from the principle of separation of powers." *Brenny v. Bd. of Regents of Univ. of Minn.*, 813 N.W.2d 417, 421 (Minn.App.2012).

In this case, the university's denial of relators' relocation benefits under the URA is a quasi-judicial decision. *See Minn. Ctr. for Envtl. Advocacy v. Metro. Council*, 587 N.W.2d 838, 842 (Minn.1999) (describing three factors that characterize quasi-judicial decisions); *see also Maye v. Univ. of Minn.*, 615 N.W.2d 383, 386 (Minn.App.2000). Quasi-judicial decisions are characterized by "(1) investigation into a disputed claim and weighing of evidentiary facts; (2) application of those facts to a prescribed standard; and (3) a binding decision regarding the disputed claim." *Minn. Ctr. for Envtl. Advocacy*, 587 N.W.2d at 842. Because the university is not subject to the Minnesota Administrative Procedures Act (MAPA), *see* Minn. Stat. § 14.03, subd. 1(f) (2010), certiorari is

the only method available for review of a university decision. *Shaw v. Bd. of Regents of Univ. of Minn.*, 594 N.W.2d 187, 191 (Minn.App.1999), *review denied* (Minn. July 28, 1999).

 Generally,

[r]eview by [writ of] certiorari is limited to an inspection of the record of the inferior tribunal in which the court is necessarily confined to questions affecting the jurisdiction of the board, the regularity of its proceedings, and, as to merits of the controversy, whether the order or determination in a particular case was arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of law, or without any evidence to support it.

*Dietz v. Dodge Cnty.*, 487 N.W.2d 237, 239 (Minn.1992) (quotation omitted). This general standard for review by writ of certiorari is applied to cases arising under Minnesota's corollary to the URA—the Minnesota Uniform Relocation Act (MURA), Minn.Stat. §§ 117.50–.56 (2010)—*Application of Relocation Benefits of Wilkins Pontiac, Inc.*, 530 N.W.2d 571, 574 (Minn.App.1995), *review denied* (June 23, 1995), and to cases involving appeals from decisions made by the university, *Stephens v. Bd. of Regents of Univ. of Minn.*, 614 N.W.2d 764, 768–69 (Minn.App.2000), *review denied* (Minn. Sept. 26, 2000). We therefore apply this standard of review in this appeal involving the university's decision regarding the URA.

### I. Use of Vice President O'Brien as a Hearing Officer

 Relators argue that the university violated Minn.Stat. §§ 117.012, subd. 1, 117.52, subd. 4, because it failed to initiate contested case proceedings and instead appointed Vice President O'Brien to hear their case. But relators' arguments are unpersuasive because the plain language of both statutes renders them inapplicable here.

Section 117.012, subdivision 1, reads:
Notwithstanding any other provision of law ... all condemning authorities ... must exercise the power of eminent domain in accordance with the provisions of this chapter, including all procedures, definitions, remedies, and limitations. Additional procedures, remedies, or limitations that do not deny or diminish the substantive and procedural rights and protections of owners under this chapter may be provided by other law, ordinance, or charter.

Ignoring the first sentence, relators argue without supporting authority that the second sentence means that "anyone in Minnesota is entitled to all of the protections provided for in Chapter 117 and any other laws that diminish their substantive or procedural rights (e.g. 49 C.F.R. § 24.10) are preempted by State law." But this court analyzes statutes as a whole. *See Rohmiller v. Hart*, 811 N.W.2d 585, 589 (Minn.2012) ("Our objective in statutory interpretation is to effectuate the intent of the legislature, reading the statute as a whole."). Here, the "[a]dditional procedures, remedies, or limitations" in the second sentence refer to the eminent-domain-related procedures, remedies, or limitations mentioned in the first sentence. And the nonrenewal of Jensen Field's lease is not related to an exercise of eminent-domain power. *See* Minn. Const. art. I, § 13 ("Private property shall not be taken, destroyed or damaged for public use without just compensation therefor, first paid or secured."). We therefore conclude that section 117.012, subdivision 1, is inapplicable here.

 Likewise, section 117.52, subdivision 4, is inapplicable. Subdivision 4 requires an "acquiring authority" to "initiate contested case proceedings" only "if a per-

son entitled to relocation assistance under this section does not accept the acquiring authority's offer." Minn.Stat. § 117.52, subd. 4. Relocation assistance under section 117.52 is available only if relocation benefits are not available under the URA "due to lack of federal financial participation." Minn.Stat. § 117.52, subd. 1 (2010); *see In re Wren*, 699 N.W.2d 758, 762 n. 4 (Minn.2005) ("Minnesota Statutes § 117.52, subd. 1, applies when, as here, federal relocation assistance under the . . . [ ]URA[ ] is not available because there is no federal financial participation."). The parties do not dispute the existence of federal financial participation in the university's wind turbine project, and section 117.52, subdivision 4, therefore is inapplicable to this case.

Upon review of the record, the university correctly followed the procedures for appeal of a determination of ineligibility for relocation benefits as set forth in 49 C.F.R. § 24.10(b), (g)–(h) (permitting aggrieved person to file a written appeal with displacing agency and requiring that displacing agency make a written determination and advise the person of right to seek judicial review and that agency official reviewing appeal be the agency head or authorized designee and not directly involved in action appealed); *see Chanhassen Chiropractic Ctr. v. City of Chanhassen*, 663 N.W.2d 559, 562 (Minn.App.2003) (mentioning the process for relocation-benefits decision-making under 49 C.F.R. § 24.10 (2002)), *review denied* (Minn. Aug. 5, 2003). Moreover, relators did not seek to compel the university to initiate contested case proceedings and instead submitted their arguments for resolution by Vice President O'Brien. We therefore conclude that relators' procedural challenges are without merit.

**II. Displaced Persons**

■ Relators argue that the hearing officer erred when she determined that they are not "displaced person[s]" under the URA. The URA requires agencies to pay "actual reasonable" relocation expenses whenever an agency undertakes a program or project that displaces a person. 42 U.S.C. § 4622(a). Relators' argument is persuasive.

A "displaced person" is

(i) any person who . . . moves his personal property from real property . . .

(II) on which such person . . . conducts a . . . business . . . as a direct result of rehabilitation, demolition, or such other displacing activity as the lead agency may prescribe, under a program or project undertaken . . . with Federal financial assistance in any case in which the head of the displacing agency determines that such displacement is permanent. . . .

*Id.* § 4601(6)(A)(i)(II); *see id.* § 4601(7)(C) (defining "business" as including "any lawful activity . . . conducted primarily . . . by a nonprofit organization"); 49 C.F.R. § 24.2(a)(9)(i) (2010) (corresponding regulations defining "displaced person").

In determining whether relators are displaced persons, the hearing officer focused on whether relators had property rights entitling them to relocation assistance rather than analyzing whether relators moved as a direct result of rehabilitation or demolition. The hearing officer reasoned:

The mere fact that the wind turbine project involves federal funding is not dispositive of the determination of whether [relators] are displaced persons because neither Jensen Field, Inc., nor the [relators] had any legal right to a lease extension. The Lease was not terminated by the University because it received federal funds for the wind tur-

bine project, but because the University elected not to renew the Lease.

(Footnotes omitted.) The hearing officer determined that because relators' "property rights were not directly terminated by a federal project, but by the specific terms of the Lease," they are not displaced persons. The property rights and entitlement to relocation assistance of the individual hangar owners, as subtenants of Jensen Field, are tied to Jensen Field's rights and entitlement under its lease with the university. *See Hyland v. Bishop*, 108 Minn. 518, 519, 121 N.W. 1134, 1134 (1909) (reasoning that sublessee who subleased property from a lessee after the lessee's lease term expired had no rights in the property because "his rights, whatever they were, came to an end at the expiration of [the lessee]'s term").

Relators argue that they are displaced persons because the evidence supports a determination that the only reason the university declined to renew Jensen Field's lease was because of the federal grant for the turbine project. Relators point to the university's November 2009 letter, which states that the university would be "unable to continue" the lease because the university received a federal grant to build the turbine. Relators cite *Superior Strut & Hanger Co. v. Port of Oakland*, 72 Cal. App.3d 987, 140 Cal.Rptr. 515 (1977), in which a public entity acquired property in 1968 that included a building "for the purpose of developing [the property] into a

marine terminal facility." 140 Cal.Rptr. at 517. Respondent was a tenant in the building. *Id.* The public entity elected to continue to rent the property to respondent until demolition of the buildings would be required. *Id.* More than three years later, the public entity gave respondent 30 days' notice to terminate the tenancy, and the respondent vacated sometime later. *Id.* The California Court of Appeals concluded that the respondent was a "displaced person" under the California Relocation Assistance Law (CRAL)—which was similar to an older version of the URA [2]—because "[r]espondent's move was the direct result of both the [public entity]'s acquisition of the real property and its notice to vacate the property for public use." *Id.* at 520. The court acknowledged that an interpretation of the CRAL that would not award relocation assistance to the respondent "would mean that the vast proportion of tenants who are required to move due to acquisition of real property for public use, would be ineligible for relocation benefits simply because they continued to rent from the public entity in the interim." *Id.* at 519.

This court cited *Superior Strut* with approval in *In re Relocation Benefits of James Bros. Furniture, Inc.*, 642 N.W.2d 91, 99 (Minn.App.2002), *review denied* (Minn. June 18, 2002), *superseded by statute*, Minn.Stat. § 117.50, subd. 3 (2004), *as recognized by Wren*, 699 N.W.2d at 764 n. 8. In *James Bros.*, the relator occupied

---

2. The URA originally defined "displaced person" as any person who moved personal property from real property as a "result" of an agency's "acquisition" of the real property. Pub.L. No. 91–646, § 101, 84 Stat. 1894. In 1987, Congress amended the definition of "displaced person" to include those who were displaced as a "direct result" of "acquisition," "rehabilitation, demolition," or "other displacing activity." Pub.L. No. 100–17, § 402(d), 101 Stat. 246. The CRAL was added to the California statutes in 1969. 1969

Cal. Stat. 3043. Its definition of "displaced person" originally read: "[A]ny ... business ... which moves from real property acquired by a public entity for public use." 1969 Cal. Stat. 3043. But the definition was amended in 1971 to read: "[A]ny person ... who moves his personal property from real property, as a result of the acquisition of such real property, in whole or in part, or as the result of a written order from a public entity to vacate the real property, for public use." 1971 Cal. Stat. 3154.

property under circumstances that did not clearly establish a formal lease agreement with the landlord. 642 N.W.2d at 94. In 1990, the local development authority began considering redevelopment of the leased property and surrounding area and, in 1993, purchased the leased property from the relator's landlord. *Id.* Eventually, the relator entered into a month-to-month lease with the development authority. *Id.* Six years later, when the development authority gave the relator 90 days' notice to vacate the property, relator argued that it was entitled to relocation benefits under the MURA. *Id.* at 95. This court applied the 2000 version of the MURA, Minn.Stat. §§ 117.50–56 (2000), which required acquiring authorities to provide relocation benefits to displaced persons, as required by the URA. Minn. Stat. § 117.52, subd. 1. The 2000 version of the MURA defined a "displaced person" as

> any person who moves from real property, or moves personal property from real property, as a result of acquisition undertaken by an acquiring authority or as a result of voluntary rehabilitation carried out by a person pursuant to acquisition or as a consequence thereof.

Minn.Stat. § 117.50, subd. 3. The 2000 version of the MURA did not require that the displacement be a *direct* result of the acquisition or rehabilitation, as required by the URA. This court expressly declined to construe the MURA as requiring that the displacement be a *"direct* result," as required by the URA, because the MURA's definition of "displaced person" did not include the *"direct* result" language. *James Bros.,* 642 N.W.2d at 99 (emphasis added).

In applying the 2000 version of the MURA in *James Bros.,* this court identified the dispositive issue as "whether relator's displacement six years later for a different project than was planned at the time of acquisition was 'a result of acquisition undertaken by an acquiring authority.'" *Id.* (quoting Minn.Stat. § 117.50, subd. 3). This court noted that the relator never had more than a month-to-month lease with the development authority but nevertheless concluded that the relator was a displaced person. *Id.* at 99–100. This court reasoned as follows:

> Here, where there was temporary use of the acquiring authority's property by the relocation-benefits applicant and continuing efforts by the acquiring authority to redevelop the property, we conclude that relator is a displaced person under MURA and is entitled to relocation benefits because the relocation resulted from an acquisition.

*Id.* at 100.

Although we recognize that *James Bros.* is based on the 2000 version of the MURA, which only required that the displacement be *a result* of displacing activity, and that the current version of the URA requires a *direct result,* we find the reasoning in *James Bros.* persuasive here.

In this case, the facts strongly support application of the rule of law in *James Bros.* After Jensen Field's lease expired on October 31, 2009, it and its subtenants remained in possession of the property as month-to-month tenants. *See Shirk v. Hoffman,* 57 Minn. 230, 231, 58 N.W. 990, 990 (1894) (stating that when original term of lease is less than one year and tenant holds over past expiration of lease term, tenancy reverts to month-to-month tenancy). On November 19, 2009, the university informed Jensen Field that it would extend its lease until October 31, 2010, but that it was "unable to continue" the lease "after October 31, 2010" because of the university's receipt of federal grant money to build a wind turbine—with no other reason stated. Relators vacated the land by October 31, 2010. Similar to the

relator in *James Bros.*, relators in this case temporarily used the leased property while the university planned its redevelopment with the use of federal funds; relators therefore are displaced persons. *See James Bros.*, 642 N.W.2d at 100; *see also Wren*, 699 N.W.2d at 763 ("The federal URA now provides for benefits whenever a *program or project* to be undertaken by a displacing agency will result in the displacement of any person." (quotation omitted)).

Citing several foreign cases, the university argues that relators are not displaced persons because they moved as a result of the natural expiration of their lease and because they did not have valid subleases. *Reg'l Transp. Dist. v. Outdoor Sys., Inc.*, 34 P.3d 408, 413, 418, 421 (Colo.2001) (concluding, *after* determining that the URA did not apply, that public entity could enforce a 30–day termination provision in a lease because the entity "possessed the same rights ... which any other market buyer would have"); *Se. Pa. Transp. Auth. v. Frankford 5206 Bar, Inc.*, 138 Pa. Cmwlth. 209, 587 A.2d 855, 857, 860 (1991) (concluding that when public entity acquired property and informed tenant that it would not renew tenant's lease at the end of current lease term, tenant was not a "'displaced person' since the termination of its occupancy here resulted from the natural expiration of its then current lease term and not from [the public entity's] acquisition of the [property]"); *Hindsley v. Twp. of Lower Merion*, 25 Pa.Cmwlth. 455, 360 A.2d 297, 298–99 (1976) (holding that after township acquired property, entered into lease with tenant that was renewable "absent notice of termination," and terminated lease, tenant was not displaced person because tenant "will be moving not as a result of the acquisition ... of such real property but rather, because Township, having already acquired the property, has merely declined to renew the lease" (quo-

tation omitted)). These cases are not persuasive in light of *James Bros.*, in which we focused our analysis on the plain language of the MURA rather than on the existence of property rights.

The university also argues that we should defer to the hearing officer's factual finding that, although the federally funded wind turbine project was one reason why it did not renew Jensen Field's lease, it was not the only reason. The university emphasizes the findings that its master plan for UMore Park did not include Jensen Field and that sand and gravel mining operations would preclude the use of Jensen Field in the future. But the university's argument is unpersuasive, especially in consideration of all of the record evidence. While the record reflects that the wind turbine project may not have been the *only* reason for the university's nonrenewal of Jensen Field's lease, the hearing officer's conclusion that the wind turbine project was only a proximate cause and therefore not the direct cause of relators' displacement is not supported by the record evidence.

## III. Relocation Benefits

■ Relators argue that the hearing officer erred when she concurrently determined relator's eligibility for and the amount of relocation benefits because a displacing agency must assist a displaced person in documenting a claim through relocation advisory services and claim assistance and relators' time to file a final claim for relocation benefit payments does not expire until April 30, 2012. Relators' arguments are unpersuasive.

The regulations implementing the URA do not require a bifurcated appeal process and, to the contrary, imply that an appeal—and consequently a hearing—can include multiple issues. 49 C.F.R.

§ 24.10(b) ("Any aggrieved person may file a written appeal ... in any case in which the person believes that the Agency has failed to properly consider the person's application for assistance.... Such assistance may include ... the person's eligibility for, or the amount of, a payment required under § 24.106 or § 24.107...."). We therefore conclude that the hearing officer did not err by concurrently deciding relators' eligibility for and the amount of relocation benefits.

Relators also argue that the hearing officer erred when she denied them relocation benefits. Under the URA, "[w]henever a program or project to be undertaken by a displacing agency will result in the displacement of any person, the head of the displacing agency shall provide for the payment to the displaced person of ... actual reasonable expenses in moving ... [the person's] business." 42 U.S.C. § 4622(a)(1). The regulations allow for reimbursement for a self-move.

A self-move payment may be based on one or a combination of the following:

(i) The lower of two bids or estimates prepared by a commercial mover or qualified Agency staff person. At the Agency's discretion, payment for a low cost or uncomplicated move may be based on a single bid or estimate; or

(ii) Supported by receipted bills for labor and equipment. Hourly labor rates should not exceed the rates paid by a commercial mover to employees performing the same activity and, equipment rental fees should be based on the actual rental cost of the equipment but not to exceed the cost paid by a commercial mover.

49 C.F.R. § 24.301(d)(2) (2010). A displaced person must make a claim for a relocation payment that is "supported by such documentation as may be reasonably required to support expenses incurred....

A displaced person must be provided reasonable assistance necessary to complete and file any required claim for payment." *Id.* § 24.207(a) (2010).

In addition to monetary benefits, the displacing agency must "ensure that the relocation assistance advisory services ... are made available to all persons displaced by such agency." 42 U.S.C. § 4625(b). Such relocation assistance advisory services include assisting a displaced business to "obtain[ ] and becom[e] established in a suitable replacement location." *Id.* § 4625(c)(4); *see* 49 C.F.R. § 24.205(c)(2)(i) (2010) (requiring advisory programs to include services to help businesses determine their needs and to explain the process of attaining relocation benefits and requiring such services to include "a personal interview with each business" to assess the business's needs); *see generally Delancey v. City of Austin*, 570 F.3d 590, 595 (5th Cir.2009) (holding that section 4625(b)–(c) does not create a private right of action for money damages).

Here, relators became displaced persons on November 17, 2009, when the university informed Jensen Field that it would not renew its lease and directed Jensen Field to remove the hangars and other real property from the airfield. *See* 49 C.F.R. § 24.203(b) (2010) ("Eligibility for relocation assistance shall begin on the date of a notice of ... the initiation of negotiations (defined in § 24.2(a)(15))...."); *id.* § 24.2(a)(15)(ii) (2010) (in the case of demolition or rehabilitation, defining "initiation of negotiations" as "the notice to the person that he or she will be displaced by the project or, if there is no notice, the actual move of the person from the property"). In July 2010, relators informed the university that they would seek relocation benefits under the URA and requested that the university provide them with advisory services and claim assistance.

The record evidence supports relators' claim that the university did not provide them with advisory services. In August 2010, relators obtained an estimate from All Furniture Inc. for the cost of moving personal property, equipment, and airplanes, and relators later provided that estimate to the university. In January 2011, after vacating the airfield, relators provided the university with further detail of their relocation-benefits claims. In February 2011, the university rejected relators' claims, stating:

> You have not supplied the required two bids to the University, nor were you prevented from acquiring such estimates. You have not supplied receipted bills related to the actual moving expenses incurred by your clients. Accordingly, you have not fulfilled your burden of proof to establish entitlement to moving expenses.
>
> Even if the University exercised its discretion to waive the requirement of two bids, the single bid submitted by you is without sufficient underlying data to verify or justify the alleged expenses. In addition, because your clients have actually moved [from] the property at issue, the University considers their actual, incurred expenses (if any) to be the best and most equitable measure to determine benefits. You have not supplied any data of actual, incurred moving expenses.

(Citation omitted.) The hearing officer found that relators had not submitted satisfactory evidence to support their claim for relocation benefits under the URA regulations, as follows:

> A "self-move" is permitted and reasonable expenses related to a "self-move" can be recovered under the URA. However, [relators] never provided the University [with] any notice of their intent to conduct a "self-move"; never actually provided a firm bid, other than the All Furniture estimate; and the estimate in any event was not in compliance with the URA, which requires the *agency* to secure the bid.

(Footnotes omitted.) The hearing officer's analysis is incorrect. First, the regulations allow an agency to exercise its discretion to pay "for a low cost or uncomplicated move ... *based on a single bid or estimate.*" 49 C.F.R. § 24.301(d)(2) (emphasis added). Jensen Field submitted one estimate, and although the university argues that relators' move was not simple or uncomplicated, the argument is not supported by record evidence. In its February 2011 letter, the university did not state whether relators' move was simple, uncomplicated, or otherwise. Moreover, the hearing officer did not address whether the university abused its discretion by denying relators' claims for relocation benefits even though one estimate was submitted.

Second, the hearing officer's analysis of the requirements for reimbursement for a self-move is based on outdated regulations and corresponding caselaw. The hearing officer relied on analysis contained in an unpublished opinion, *In re Application for Relocation Benefits by Mistelske,* No. A06–1429, 2007 WL 1747105, at *3 (Minn. App. June 19, 2007), in which this court applied the 1997 self-move regulation, which stated:

> If the displaced person elects to take full responsibility for the move of the business ... the Agency may make a payment for the person's moving expenses in an amount not to exceed the lower of two acceptable bids or estimates obtained by the Agency or prepared by qualified staff.

49 C.F.R. § 24.303(c) (1997). That self-move regulation was revised in 2005, and the revised version is applicable to this

case. 70 Fed.Reg. 603 (Jan. 4, 2005), 70 Fed.Reg. 22611 (May 2, 2005). Under the revised regulation, estimates may be "prepared by a commercial mover or qualified Agency staff person." 49 C.F.R. § 24.301(d)(2). Neither caselaw nor the regulations assign responsibility for obtaining estimates to a particular party. Therefore, under the current regulation, the university can be the source of at least one of the estimates.

■ Here, three months prior to its move, relators informed the university that they would seek relocation benefits and that they elected to conduct a self-move. Relators subsequently provided the university with a single estimate of the cost of its move: $141,825. The record does not show that the university provided relators with advisory services required by 42 U.S.C. § 4625(b), and the record reveals that the university obtained no estimates or bids. The university's argument that relators cannot recover because they did not provide the university with actual costs from its move or because they sold some property is unpersuasive. *See id.* § 24.301(g)(14) (2010) (allowing payment for actual loss of tangible personal property, which is the lesser of the fair market value of the item or the estimated cost of moving the item).

The URA mandates that displacing agencies pay displaced persons. 42 U.S.C. § 4622(a). Once a person is displaced, the question for the displacing agency is not *if* it should pay the displaced person but *how much* it should pay the displaced person. The law does not countenance the university's lack of action and expectation that its laxness would defeat a displaced person's claim; the URA requires more. *Tullock v. State Highway Comm'n of Mo.,* 507 F.2d 712, 715 (8th Cir.1974) (stating that the URA clearly requires payment of a moving expense and dislocation allowance and es-

tablishment of relocation-assistance advisory services to minimize hardships to such persons in adjusting to relocation).

Because relators provided the university with an estimate of their moving costs and are entitled to relocation benefits under the URA, and because the university did not offer relators any relocation assistance, relators are entitled to payment of $141,825, based on their single estimate.

## DECISION

The university did not violate Minn.Stat. §§ 117.012, subd. 1, 117.52, subd. 4, when it followed the procedures for appeal set forth in 49 C.F.R. § 24.10(b), (g)–(h), to satisfy the appeal rights of a person claiming a right to relocation benefits under the URA. The hearing officer did not err by concurrently determining relators' eligibility for and the amount of relocation benefits. Because we conclude that substantial evidence in the record supports a conclusion that relators are displaced persons under the URA and are entitled to reimbursement for their estimated moving expenses under 49 C.F.R. § 24.301(d)(2), relators are entitled to payment of $141,825, based on their single estimate from All Furniture Inc. The decision of the hearing officer is therefore reversed and remanded for payment of relocation benefits to relators in accordance with the All Furniture Inc. estimate.

**Reversed and remanded.**